**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN E. REID AND ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 19-cv-6781 |
| | ) | |
| v. | ) | |
| | ) | **Jury Demanded on** |
| NETFLIX, INC., AVA DUVERNAY, and | ) | **Counts I, II III, V, VI, and VII** |
| ARRAY ALLIANCE, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

NOW COMES Plaintiff, John E. Reid and Associates, Inc. ("Reid"), by its undersigned counsel, Jack J. Carriglio and Corey T. Hickman of Cozen O'Connor, and for its Complaint against Netflix, Inc. ("Netflix"), Ava DuVernay ("DuVernay"), and Array Alliance, Inc. (Duvernay and Array Alliance, Inc. shall collectively be referred to as the "Duvernay Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1.      This Complaint is an action brought by Reid to redress defamation and other related wrongful conduct by Netflix, the publisher of the four-part limited series, *When They See Us*, DuVernay, the writer, creator, and director of *When They See Us*, and Array Alliance, Inc., a film distributor founded by DuVernay and one of the production companies associated with *When They See Us*.

2.      Reid is a company that for many years has provided training programs and other services in Illinois and many other states and abroad to law enforcement agencies, all branches of the United States military and other military and intelligence communities, and businesses as to interview and interrogation measures. Reid's clients in the United States have included the United

States Marshals Service, Federal Bureau of Investigation ("FBI"), Drug Enforcement Administration ("DEA"), Federal Reserve Board, United States Department of State, and all branches of the United States Military. Reid's foreign clients have included the Dubai Police Force, the Canadian Special Operations Forces Command Department of National Defense, and the Ontario and Ottawa Departments of Public Safety. Reid also has maintained a substantial client base in the State of Illinois where it resides, including the police departments or sheriffs of Aurora, Barrington, Buffalo Grove, Burr Ridge, Carbondale, Champaign, Cook County, Crystal Lake, Darien, DuPage, East Moline, East Peoria, Elgin, Evergreen Park, Franklin Park, Galesburg, Genesco, Glenview, Highland Park, Lockport, Matteson, McDonough County, McHenry County, Norridge, Oak Brook, Orland Park, Park Forest, Park Ridge, Plainfield, Rockford, Rosemont, Schaumburg, Tinley Park, and Wheeling. Reid regularly conducts training seminars in Illinois. A number of prospective clients of Reid are in Illinois and Reid actively markets its services there.

3.     The "Reid Technique"® is a trademark of Reid and has been the method that Reid teaches as to the interviewing, questioning and interrogation of subject persons. The Reid Technique is a structured interview and interrogation process that consists of three stages: fact analysis, investigative non-confrontational interview, and interrogation. Vitally important to the instant case is that the Reid Technique does *not* involve and prohibits: striking or assaulting a subject, making any promises of leniency, denying a subject any rights, conducting excessively long interrogations, and denying a subject any physical needs. Reid also urges that extreme caution and care be taken when interviewing or interrogating juveniles or those with mental impairments. This information has been readily publicly available in numerous places, including on Reid's website. This information is also contained in Reid's publicly available textbooks which teach the Reid Technique.

4.      On May 31, 2019, in collaboration with the DuVernay Defendants, Netflix released for worldwide streaming a "Netflix Original" and four-part limited series entitled *When They See Us*, which purports to portray true events surrounding what is known as the "Central Park Jogger Case." The program has been continuously re-published since May 31, 2019 and still remains available for viewing. The series depicts the interrogations, confessions, convictions, and imprisonments of juvenile defendants Antron McCray, Raymond Santana Jr., Yusef Salaan, Kevin Richardson, and Korey Wise (the "five defendants"), regarding the rape and assault of a victim in Central Park in New York City in 1989. The program also reflects a subsequent re-investigation of the case, the withdrawal of the charges against the five defendants, and their release from prison.

5.      The *When They See Us* publication includes trailers and a *When They See Us Injustice Featurette*.

6.      Netflix has described *When They See Us* as "portraying the real-life story of five teenagers, Yusef Salaam, Antron McCray, Kevin Richardson, Raymond Santana, and Korey Wise, and how they were accused of a crime they did not commit; convicted based on false confessions, despite a lack of physical evidence and forced to grapple with a trial, prison time, and return to society as grown men after their imprisonment."

7.      In Episode Four of *When They See Us*, which is the final episode of the series, the Defendants depict a conversation between Michael Sheehan, a New York City detective who worked on the Central Park Jogger Case and was involved in eliciting defendants' confessions, Nancy Ryan, a Manhattan Assistant District Attorney who oversaw the 2002 re-investigation which led to the dismissal of the charges against the five defendants, and another "Man" who is assisting Ryan as her "partner" in the re-investigation.

8.      In earlier episodes of "When They See Us" and prior to the scene reflecting the conversation among Sheehan, Ryan, and her partner, Defendants portray as true that Detective Sheehan and other police had struck and abused the five defendants, isolated and subjected them to many continuous hours of questioning, without food or bathroom breaks, and while withholding parental supervision. Defendants portray as true that Sheehan and other police coerced the five defendants to confess to crimes they had not committed. Defendants depict as true that the coerced confessions were integral to the prosecution and wrongful convictions of the five defendants. Defendants portray as true that the five defendants were incarcerated for long periods of time and endured abuse and trauma while imprisoned.

9.      In Episode Four, prior to the conversation with Sheehan, Ryan, and her partner that is depicted, Defendants portray as true that Ryan, her partner, and others assisting them investigated and established that there was a perpetrator, other than the five defendants, who had solely committed the crime. Ryan and her partner also determined and established that the five defendants were innocent and had involuntarily confessed to committing the crime because of coercive tactics of Sheehan and other police in eliciting the confessions.

10.      During the scene in Episode Four reflecting the discussion among Ryan, her partner, and Sheehan, Ryan presents Sheehan with the finding that another person, Matias Reyes, had committed the crime based on his confession and other evidence including DNA test results. Ryan confronts Sheehan with the fact that wrongful and coerced confessions were elicited from the five defendants by him and others and that the defendants had been wrongfully convicted and incarcerated. Ryan and her partner tell Sheehan that he overlooked evidence that pointed to the real rapist and instead let stand the statements extracted from the five defendants. Ryan's partner then states to Sheehan:

-4-

**You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you**.

11.     The remainder of Episode Four continues to relate true events surrounding the case including that the charges against the five defendants were dismissed and they were exonerated as the perpetrator, Mathias Reyes, was convicted of the crime.   The final episode also reflects the release of the five defendants from incarceration and their subsequent recovery of $41 million in damages arising from their civil claims against the City of New York for the abuse they sustained arising out of the illegal, coerced, and wrongful confessions, convictions, and incarcerations.

12.     The context of *When They See Us*, based on the statements made in the program and the reasonable inferences from what is portrayed, is that it is true that Sheehan and other police used coercive, illegal and abusive tactics in the interrogation of the five defendants which produced false confessions to crimes they did not commit, their wrongful convictions, incarcerations, and suffering.   The series also depicts as true that the City of New York eventually was held accountable, to the tune of $41 million, for the wrongful actions of Sheehan and others, including their coercive tactics in the interrogations and in eliciting the false confessions.

13.     The context of Episode Four also portrays Ryan and her partner as persons who uncovered the truth and who spoke accurately as to what had occurred in the Central Park Jogger Case.

14.     Defendants' publications and depictions in Episode Four of the aforesaid statements relating to the Reid Technique falsely disparage and defame Reid.   First, the statements defame Reid as they falsely correlate the Reid Technique to squeezing statements out of the five defendants "after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision."   The conduct described is not the Reid Technique.   Second, the

statement that the "Reid Technique has been universally rejected" is also false and defamatory. The Reid Technique has not been "universally rejected." Defendants knew that the statements were false or recklessly disregarded the truth when they published them.

15.     *When They See Us* assigns blame for what occurred in the Central Park Jogger Case. Besides Sheehan, other police officers, and prosecutors, Defendants also blame Reid for being the proponent of coercive tactics that were used by Sheehan and others in eliciting coercive and wrongful confessions. The program falsely represents that squeezing and coercing statements from juvenile subjects after long hours of questioning without food, bathroom breaks or parental supervision, is synonymous with the Reid Technique.

16.     Netflix has stated that the *When They See Us* series is an "exploration and examination of the consequences of acceptance of the Reid Technique – acceptance by the five boys, acceptance by the prosecutors who presented their resulting confessions as evidence, acceptance by the judge who allowed the confessions to be introduced into evidence, acceptance by the jury of the truth of the confessions, and acceptance by society of their guilt after they served their prison sentences and were released."

17.     The depicted conversation among Ryan, Sheehan and her partner, the "Man" in Episode Four, did not actually occur. Defendants fabricated the conversation including the references to the Reid Technique. Defendants did so to make the program more appealing by spreading the blame for the wrongful conduct to Reid. Defendants intended to incite an audience reaction against Reid for what occurred in the Central Park Jogger Case and for the coercive interrogation tactics that continue to be used today. Defendants published the statements in *When They See Us* in an effort to cause a condemnation of the Reid Technique.

18.     On June 25, 2019, Netflix announced that *When They See Us* had been viewed by over 23 million people in the United States and other countries within the first month of its release and was Netflix's most-watched series since its release. Many of Reid's customers and potential customers, who are familiar with the Reid Technique, have viewed *When They See Us*. Reid's reputation and business have been harmed by Defendants' improper conduct, while Defendants continue to profit from their defamatory publications.

## THE PARTIES

19.     Reid is a corporation incorporated under the laws of the State of Illinois. Reid's principal place of business is located at 209 W. Jackson Blvd., Suite 400, Chicago, IL 60606. Reid is the creator and developer of the Reid Technique, a widely used approach to question subjects in the course of interviews and interrogations. Reid's experienced team of instructors provides training seminars to law enforcement and other security personnel. Since its training programs were first offered in 1974, more than 500,000 professionals in the law enforcement and security fields have attended Reid's programs. Participants come from private sector organizations such as retail, finance, health care, manufacturing, gaming, education, and insurance, among others. Participants also come from all levels of law enforcement and government including every branch of the United States Military. Reid has presented programs in the United States, Canada, Europe, Asia, and the Middle East. Reid has substantial clientele in the State of Illinois where it is based. Reid's customers and prospective customers in Illinois and elsewhere know of the Reid Technique and readily recognize references to it.

20.     Netflix is a corporation incorporated under the laws of the State of Delaware. Netflix's principal place of business is located at 100 Winchester Circle, Los Gatos, California 95023. According to Netflix's website, Netflix is "the world's leading internet entertainment

service with over 151 million paid memberships in over 190 countries," allowing members to "watch as much as they want, anytime, anywhere, on any internet-connected screen."[1]  In the United States alone, Netflix has approximately 60.2 million subscribers, including many in Illinois.[2]

21.     Duvernay is a filmmaker residing in the State of California. Duvernay is the writer, creator, and director of *When They See Us*.

22.     Array Alliance, Inc. ("Array") is a Delaware corporation with its principal place of business at 16000 Ventura Blvd., Suite 900, Encino, California.  Array produced *When They See Us*.  DuVernay is the chief executive officer of Array.  As to all relevant allegations of this Complaint, DuVernay acted for herself and as an agent for Array.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), as this is a civil action between "Citizens of different States" wherein the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

24.     This Court has personal jurisdiction over Netflix because it is a corporation doing business within the State of Illinois; and, Netflix transacted business and committed tortious acts within the State of Illinois that are the subject of this action. Netflix is also registered to do business in Illinois.  This Court has personal jurisdiction over DuVernay because she committed tortious acts within the State of Illinois that are the subject of this action. This Court has personal

---

[1] https://media.netflix.com/en/about-netflix

[2] https://www.cnn.com/2019/04/16/media/netflix-earnings-2019-first-quarter/index.html

jurisdiction over Array because it committed tortious acts within the State of Illinois that are the subject of this action.

25.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the instant claim occurred in the Northern District of Illinois where Reid is situated and where Reid has substantial clientele and potential customers who were exposed to the false information published by Netflix in *When They See Us*. Alternatively, venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(3) because this Court has personal jurisdiction over Defendants.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.     The Reid Technique

26.     The Reid Technique was developed by John E. Reid and was first taught to investigators in 1974.  Since that time it has been a widely used approach to question subjects in the course of interviews and interrogations.  Reid has taught the Reid Technique to thousands of individuals in business, law enforcement, and government organizations, including the military.

27.     The Reid Technique is widely published and available for review. Reid's primary textbook, Criminal Interrogations and Confessions, 5th Edition (2013), describes and teaches the Reid Technique in substantial detail. Reid's website also has information regarding the Reid Technique, including PowerPoint presentations, educational handouts, recent court decisions and media relating to Reid, among other materials.

28.     Confessions obtained using the Reid Technique have been upheld by many courts in many different jurisdictions.

29.     Reid's employees have served as expert witnesses in a number of cases, including but not limited to, testifying as experts on interview and interrogation techniques for the

prosecution and on other occasions for the defense as to allegedly wrongly convicted defendants. These matters include the 2006 case of *Earl Washington v. Virginia*, where the defendants were represented by the Innocence Project; the 2007 case of *Kevin Fox v. Will County*; and the 2011 case of *Ryan Ferguson v. Will County*.

30.     The Reid Technique is a structured interview and interrogation process that consists of three stages: fact analysis, investigative non-confrontational interview, and interrogation.

31.     The factual analysis stage consists of reviewing the case facts and evidence to identify the potential scope of suspects and their characteristics, as well as possible motives.

32.     Based on an analysis of the facts, the Reid Technique then calls for the investigator to prepare an interview strategy, including a list of issues and questions to raise with a subject. Interview questioning generally includes, but is not limited to, background information regarding the subject and his or her recollection of the incident in question. The interview is non-accusatory, and the interviewer is to be neutral and objective in seeking information from the subject.

33.     Based on information gathered during the interview stage, the investigator can either eliminate the subject as truthful, continue the investigation of the subject, or initiate interrogation of the subject. The interrogation phase consists of nine steps which may cause a guilty subject to confess to his or her involvement and to relate details regarding the commission of a crime or incident.

34.     The Reid Technique does not involve and prohibits: striking or assaulting a subject, making any promises of leniency, denying a subject any rights, conducting excessively long interrogations, or denying a subject any physical needs.  Reid also urges that extreme care and caution be used with juveniles or those mentally impaired. All of this information is publicly available upon even the most cursory of searches. For example, Reid's website provides an

"Educational Information" section that includes ten PowerPoint presentations providing detailed information about the use of the Reid Technique. Reid also publishes numerous textbooks which are available to the public detailing the use of the Reid Technique. Criminal Interrogation and Confessions, 5th Edition (2013), is the primary textbook used for teaching the Reid Technique.

35. For all relevant time periods, Reid's website has contained a substantial number of articles and teaching aids which are publicly available, easy to access, and make clear that the methods described in *When They See Us* are not part of the Reid Technique.

36. A PowerPoint prominently featured on Reid's website since September 29, 2013, entitled "What is the Reid Technique?," provides that the "basic principles" of the Reid Technique include:

- "Do not make any promises of leniency"
- "Do not threaten the subject in any way"
- "Do not deny the subject any of their rights"
- "Do not conduct excessively long interrogations."
- "Do not deny the subject the chance to satisfy their physical needs."
- "Exercise caution when interviewing juveniles or persons with mental or emotional disabilities."

37. All of these principles are repeated verbatim in another featured PowerPoint entitled "False Confession Issues," which has also been available on Reid's website since September 29, 2013. That PowerPoint provides that "false confessions are not caused by the application of the Reid Technique, but rather they are usually caused by interrogators engaging in improper behavior that is outside of the parameters of the Reid Technique – behaviors which the courts have found to be coercive – threats, promises, denial of rights, etc." The PowerPoint went on to cite a 2011 opinion from the US District Court for the District of Massachusetts, which held that "the proffered expert testimony to the effect that the Reid technique enhanced the risk of an unreliable confession lacked any objective basis for support whatsoever."

38. The "Educational Information" section on Reid's website also features articles describing the Reid Technique in detail, including the core principles listed above and other best practices. These articles include *How the Courts View the Reid Technique* (2016) and *The Reid Technique: A Position Paper* (2017).

39. Reid's website describes that special care must be taken when the Reid Technique is used with juveniles or those with mental impairments. On September 29, 2012, Reid published an article on its website entitled "Interrogators should exercise special precautions when interviewing juveniles or individuals with mental or psychological impairments," which provided:

> Basic Law Enforcement training manuals oftentimes point out specific precautions that should be exercised when dealing with mentally impaired persons. For example, the state of North Carolina basic law enforcement training manuals specifically point out the following: Mentally impaired (retarded) individuals have poor judgment; are easily influenced by authority figures; may be unable to formulate thoughts and answer questions readily; may not always understand their rights; have an impaired ability to reason and understand the consequences of their actions. Consequently, when an investigator is dealing with a mentally impaired individual, they should "consider whether the person they're interviewing understood the question being asked".... "go slowly and that rapid questions during an interview or confrontation may confuse or frighten the person" ... "the use of suggestive questions must be avoided because such questions tend to produce erroneous answers"... It is imperative for all interrogators to exercise extreme caution during the interrogation of a juvenile or a person who is mentally or psychologically impaired, and to keep in mind the safeguards outlined above.

40. An article dated June 4, 2017, on Reid's website, entitled "The Juvenile Law Center, Wicklander-Zulawski and Professor Garrett refer to Reid as the 'leading law enforcement training firm' and quote Reid as a reference on proper juvenile interrogation techniques," provides in relevant part:

> Reid & Associates, Inc., developer of the Reid Technique of interrogation and leading law enforcement training firm, also instructs law enforcement officers to take special precautions when interviewing juveniles or individuals with significant mental or psychological impairments. Every interrogator must exercise extreme caution and care

-12-

when interviewing or interrogating a juvenile or a person who is mentally or psychologically impaired. Certainly these individuals can and do commit very serious crimes, but since many false confession cases involve juveniles and/or individuals with some significant mental or psychological disabilities, extreme care must be exercised when questioning these individuals and the investigator has to modify their approach with these individuals.

Furthermore, when a juvenile or person who is mentally or psychologically impaired confesses, the investigator should exercise extreme diligence in establishing the accuracy of such a statement through subsequent corroboration. In these situations it is imperative that the interrogator does not reveal details of the crime so that they can use the disclosure of such information by the suspect as verification of the confession's authenticity.

41.     An "Investigator Tip" on Reid's website, dated July 2016 and entitled "Making a Murderer: the Reid Technique and Juvenile Interrogations," also details the extreme caution that must be used with regards to juveniles.

42.     Also related to the Dassey v. Dittmann case in the Making A Murderer series and available on the Reid website since January/February 2017 were "Investigator Tips" which included:

"Physical coercion, torture, duress, denial of rights, threats, and promises of leniency are the poison pills of legally admissible, reliable and voluntary confessions.

43.     The "Investigator Tips" also reflected concerns given "Dassey's age, intellectual deficits, and the absence of a supportive adult…" during Dassey's interrogation.

44.     Reid's website has also reflected materials demonstrating that withholding of parental or adult supervision is not part of the Reid Technique. Reid published an article on its website, dated January 16, 2016, which cited a juvenile interrogation guide emphasizing the importance of a juvenile having a "friendly adult" to consult with throughout the interrogation process: "It is essential to involve a 'friendly adult' in the juvenile interrogation process and to allow him or her meaningful opportunities to privately consult with the juvenile throughout the interrogation."

45.     Further, a handout which is contained in Reid's primary textbook, and which since

at least 2015 has been provided to all persons who attend Reid's courses, states:

> The best way to avoid false confessions is to conduct interrogations in accordance
> with the guidelines established by the courts, and to adhere to the following
> practices:
>
> - Do not make any promises of leniency
> - Do not threaten the subject with any physical harm or inevitable consequences
> - Do not conduct interrogations for an excessively lengthy period of time
> - Do not deny the subject any of their rights
> - Do not deny the subject the opportunity to satisfy their physical needs
> - Withhold information about the details of the crime from the subject so that if
>   the subject confesses he can reveal information only the guilty would know
> - Exercise special cautions when questioning juveniles or individuals with mental
>   or psychological impairments
> - Always treat the subject with dignity and respect
> - The confession is not the end of the investigation – investigate the confession
>   details in an effort to establish the authenticity of the subject's statement
>
> False confessions are not caused by the application of the Reid Technique, they are
> usually caused by interrogators engaging in improper behavior that is outside the
> parameters of the core principles of The Reid Technique – using improper
> interrogation procedures – engaging in behavior that the courts have ruled to be
> objectionable, such as threatening inevitable consequences; making a promise of
> leniency in return for the confession; denying a subject their rights; conducting an
> excessively long interrogation; etc.

46.     Reid's primary textbook further expands on this information. The 3rd Edition

(1986) of that textbook which was in effect at the time of the Central Park Jogger Case provided,

in relevant part:

- The clearest example of an interrogation practice that will void a confession is the infliction
  of physical force or pain upon the person under interrogation, because it is an uncontestable
  fact that harm of this nature may produce a confession of guilt from an innocent person.
  (p. 214)

- This is also true as regards indirect physical harm; for instance, an unduly prolonged,
  continuous interrogation, especially by two or more interrogators working in relays, or the
  deprivation of food, water, or access to toilet facilities for an unreasonable period of time.
  (p. 214)

-14-

- A threat of physical harm may have a similar effect – the extraction of confessions from innocent persons. Similarly, an interrogator's promise to a suspect that if he confesses he will go free or receive only a lenient penalty will nullify the confession because such a promise may induce an innocent person to confess rather than to risk criminal prosecution or severe punishment. (p. 214)

- Of the various forms of indirect force, the one that most suggests confession coercion is the participation of multiple interrogators over a lengthy period of time . . . Moreover, as to the time factor, rarely will a competent interrogator require more than approximately 4 hours to obtain a confession from an offender, even in cases of a very serious nature. (p. 310)

- With regard to the threat factor of coercion, the most obvious example of conduct that will invalidate a confession is when an interrogator leads a suspect to believe that unless he confesses, he will be subjected to a loss of life or other bodily harm. The belief does not require a specific expression from anyone to that effect; for example, it may result from an act of physical abuse to some other presumed suspect within sight or hearing of the one under interrogation. (p. 311)

- Several state legislatures have been more definitive with respect to the interested adult requirement. They have prohibited any waiver without consultation with a parent or lawyer, and have also declared invalid any confession obtained during an interrogation outside the presence of a parent (or other guardian) or lawyer. (pp. 243-44).

- The issue of confession voluntariness in any particular youthful suspect case is determined on the basis of what the courts term the 'totality of the circumstances.' This means that all factors must be considered – the youth's intelligence, education, background, and the interrogation setting – to determine his vulnerability to possible suggestions and subtle pressures on the part of this interrogator. (p. 243).

47.     These same concepts are reiterated throughout the 4th Edition (2001) and current 5th Edition (2013) of the textbook.

48.     Courts that have examined the Reid Technique have overwhelmingly upheld the admissibility of confessions and found that Reid's procedures are in compliance with acceptable interrogation practices. In cases where confessions are rejected, interrogators frequently have

engaged in behaviors outside the guidelines established in the Reid Technique, including making promises of leniency, striking or threatening the subject, denying the subject rights or physical needs, and conducting excessively long interrogations, or engaging in conduct that is not appropriate for a juvenile or person with a mental impairment.

**B.** **Netflix Published and Continues to Publish *Making a Murderer* Season 2, Recognizing the Widely Accepted Use of the Reid Technique and That Alleged Coerced Confessions May Occur When The Reid Technique Is Not Followed**

49. On December 18, 2015, Netflix released a true crime documentary series entitled *Making a Murderer*, which tracked the suspects accused and convicted of the 2005 murder of Teresa Halbach, including their court proceedings, trials, appeals, and incarcerations. One of the suspects, Brendan Dassey, a minor with learning disabilities, was arrested after confessing to law enforcement his involvement in the crime. His conviction was challenged on grounds that included the assertion that his confession was involuntary and had been coerced. The Seventh Circuit upheld Dassey's confession in *Dassey v. Dittman*, 877 F.3d 297 (7th Cir. 2017), despite law enforcement's failure to use the Reid Technique or adhere to the basic best practices guidelines that are clearly stated by Reid, and use of practices that the Reid Technique expressly teaches investigators *not* to use.

50. On October 19, 2018, Netflix released Season Two of *Making a Murderer.* One of the issues examined by that program is whether the confession of Dassey, a minor with disabilities, was coerced based on the techniques used by the interrogators. Both seasons of "Making a Murderer" remain available for on-demand viewing.

51. In Episode Two of *Making a Murderer* Season Two, attorneys Laura Nirider and Steven Drizin of the Northwestern University School of Law Center on Wrongful Convictions discuss errors that the interrogators made during Dassey's interrogation. They refer to Reid and

the Reid Technique, distribute to their audience a hand-out of the Reid Technique, and highlight that the interrogators of Dassey allegedly coerced the confession because they did not properly follow the Reid Technique and deviated from it substantially.

52.     During the episode, Nirider states that Reid has "developed the most widely used interrogation technique in the country." And Drizin notes:

> John E. Reid cautions police officers, 'deceptive tactics should not ordinarily be used with individuals who have significant mental limitations or with youthful suspects of low social maturity'."

> John E. Reid & Associates tells investigators that they should hold back some facts, because if the suspect can give you those facts, then you have a pretty good idea that what the suspect is telling you is true. … These officers fed him the three critical facts that were not publicly released before [Dassey's] interrogation: Teresa Halbach was shot in the head, her personal items were found in a burn barrel on the Avery salvage yard, and the fact that someone went underneath the hood of the car and did something with the engine.

***

> "Contamination occurs when investigators grow frustrated with an innocent person's inability to give them those facts. They wanted this information in the worst way. And they got it in the worst way. [Dassey] has confessed."

53.     In connection with the "Making a Murderer" series, Netflix knew of the Reid Technique, that it was widely used by law enforcement authorities, and that the alleged coerced confession by Dassey occurred because the interrogators failed to use the Reid Technique or adhere to the basic best practices guidelines that are clearly stated by Reid, and instead did exactly what The Reid Technique teaches investigators *not* to do.

**C.     Netflix, in Collaboration with the DuVernay Defendants, Published and Continues to Publish *When They See Us*, Which Defames Reid**

54.     Approximately seven months after Netflix released Season Two of *Making A Murderer* and while it was available for on-demand viewing, on May 31, 2019, Netflix, in collaboration with the DuVernay Defendants, aired *Whey They See Us,* a program that purported

to portray true events surrounding the Central Park Jogger Case. The four-part series depicts interrogations, confessions, trials, convictions, and imprisonments of the five defendants regarding the 1989 rape and assault of a woman who had been jogging in Central Park in New York City. In 1989, when their arrests, interrogations and confessions occurred, the five defendants were between 14 and 16 years of age and in junior high school. The trailer to Episode One of *When They See Us* is captioned "In the Spring of 1989, five boys of color are arrested, interrogated and coerced into confessing to the vicious attack of a woman in Central Park".

55. *When They See Us* also portrays as true events surrounding a 2002 re-investigation of the case, a confession and DNA evidence reflecting the guilt of Mathias Reyes, a man not among the five defendants, the dismissal of charges, and the release of the five defendants who were still in prison at that time. The series also reflects a 2014 settlement award of 41 million dollars by the City of New York to the five defendants arising from their claims that their convictions and imprisonments were wrongful and their interrogations and confessions were coercive and illegal.

56. In Episode Four of *When They See Us*, a meeting is portrayed among Michael Sheehan, a New York City detective who had worked on the Central Park Jogger Case and who had been involved in eliciting the defendants' confessions, Nancy Ryan, a Manhattan Assistant District Attorney who oversaw the re-investigation leading to the vacating of the convictions against the five defendants, and another person, identified in the script only as "Man," who is assisting Ryan in her discussion with Sheehan, and whom Netflix has identified as her "partner". Earlier in Episode Four and prior to the meeting with Sheehan, Ryan and her partner are seen as gathering information as to the truth of the events surrounding the crime including: the confession and DNA evidence reflecting the guilt of Matias Reyes, the flaws in the evidence against the five defendants, and interrogations which included the police striking and otherwise physically abusing

the five defendants, together with the coerced confessions they experienced. Ryan and her partner are portrayed to be truthfully and accurately analyzing what occurred in the Central Park Jogger Case.

57.     In the Episode Four meeting with Sheehan, Ryan informs him of the new evidence and criticizes the adequacy of his investigation and defendants' confessions. Sheehan replies: "They gave statements that I believe were true."

58.     Ryan's partner then states to Sheehan:

**You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you.**

59.     Sheehan responds: "I don't even know what the fucking Reid Technique is. Okay? I know what I was taught. I know what I was asked to do and I did it."

60.     In Episode Four through their use of the characters of Ryan and her partner who are portrayed as truth tellers, Defendants identify the Reid Technique with the squeezing of statements out of the five defendants, who are minors, "after 42 hours of questioning and coercing, without food, bathroom breaks, [and] withholding parental supervision." That statement is false. The Reid Technique does not endorse long hours of questioning, or coercing and depriving subjects of food and bathroom breaks. The Reid Technique does not teach the withholding of parental supervision for minor subjects who are being questioned by law enforcement. The Reid Technique in fact expressly prohibits excessively long interrogations, denying subjects any of their rights, and denying subjects the opportunity to satisfy their physical needs. The Reid Technique also requires that special caution be exercised when questioning juveniles or individuals with mental or psychological impairments.

61.     The statement, "The Reid Technique has been universally rejected", is also false. It was false as of 2002, the apparent time of the alleged conversation among Ryan, her partner, and Sheehan portrayed in Episode Four.

62.     Defendants made the false statements as of the date of initial publication of *When They See Us*, May 31, 2019, and Defendants continue to re-publish the false statements today as Netflix continues to stream the series.

63.     Sheehan's saying that he did not know the name of the Reid Technique does not detract from the falsity of the statements Defendants have made. The viewers have already been told by Ryan and her partner, who are portrayed as credible and truthful, of the alleged missteps in the investigation and the abusive interrogations and coerced confessions of the five defendants, which are portrayed as resulting from the Reid Technique. When Sheehan states he did not know the name of the technique he used, it does not detract from Defendants' making clear that it was indeed the Reid Technique, a technique Defendants represent as having been "universally rejected".

64.     Since at least 2002 and through today, the Reid Technique has been a widely accepted method of interviewing and interrogating subjects, as demonstrated by Reid conducting over 6,500 seminars and training more than 200,000 people during that time period. It was not "universally rejected" in 2002 or since. "Universally" means including or covering all or a whole collectively without limit or exception. "Rejected" means not given approval or acceptance. The statement that the Reid Technique has been "universally rejected" is false. In the context of *When They See Us*, the statement tells the viewer that the Reid Technique is not approved or accepted by anyone. The natural inference from the entire statement Defendants made as to Reid is that without exception interviewers and interrogators have not approved or accepted the Reid Technique which

permits the abusive and coercive measures used by Sheehan and other police with the five defendants. That is false. The Reid Technique does not condone such behavior. The Reid Technique has been viewed by many courts as a legal method of interrogation in cases that have rejected claims that confessions were coerced. The Reid Technique has been continuously used in the United States and other countries. It has been employed by various United States federal law enforcement authorities, a multitude of state and local police, and many public and private companies in connection with internal investigations and human resource matters.

65. The aforementioned false statements as to the Reid Technique were fabricated by Defendants and are not historically accurate. The "Man", Ryan's partner, is a fictional character Defendants created.

66. When it published and re-published *When They See Us,* Netflix knew that the Reid Technique was a widely accepted interrogation technique in the United States.

67. Netflix also knew that the interrogation measures used against the five defendants were not condoned by Reid or permitted by the Reid Technique.

68. *Making a Murderer* Season Two, initially published by Netflix only a few months before *When They See US* was aired, and still available for viewing, contains a scene in which the Reid Technique is described as "the most widely used interrogation technique in the country," and points out the ways in which the Reid Technique was not properly followed in the interrogation of a minor subject with learning disabilities, Brendan Dassey. Netflix also knew from *Making A Murderer*, Season Two, that the coercive conduct of the police as to the five defendants in *When They See Us* should not have been identified as the Reid Technique.

69. At the very least, Netflix recklessly disregarded the truth of the fabricated and false statements in *When They See Us* regarding Reid and the Reid Technique. Even the most basic

search would have revealed that the Reid Technique has not been "universally rejected," and that it does not condone and prohibits excessively long interrogations, coercive conduct, including striking or assaulting subjects, or depriving them of their rights, physical needs, or, in the case of minors, withholding their parental supervision.

70.     With respect to the accuracy of the statements as to the Reid Technique in *When They See Us*, Netflix did research that included its review of articles by:  Douglas Starr, "The Interview: Do Police interrogation techniques produce false confessions?"  The New Yorker, December 6, 2013; and Douglas Starr, "Juan Rivera and the Dangers of Coercive Interrogation", The New Yorker, May 22, 2015.  None of the articles or any other research done by Netflix identified the Reid Technique with striking and assaulting subjects during interrogations, abusing juvenile subjects and withholding parental supervision during unduly long hours of interrogation, and depriving subjects of bathroom breaks and food.  None of the articles or any other research reviewed by Netflix reflected that the Reid Technique had been universally rejected.

71.     Netflix entertained serious doubts as to the truth of the statements within *When They See Us* that the Reid Technique includes striking and assaulting subjects during interrogations, abusing juvenile subjects and withholding parental supervision during long hours of interrogation, and depriving subjects of bathroom breaks and food.

72.     Netflix entertained serious doubts as to the truth of the statement in *When They See Us* that the Reid Technique has been universally rejected.

73.     Despite its serious doubts as to the truth of these statements, Netflix published and continues to publish *When They See Us* and the false statements identify the Reid Technique with the squeezing of statements from juvenile subjects "after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision".

74.    Despite serious doubts as to the truth of these statements that it entertained, Netflix published and continues to publish *When They See Us* and the false statement that the Reid Technique has been universally rejected.

75.    Similarly, the DuVernay Defendants did research in connection with their work on *When They See Us*.    Their research included the areas of law enforcement interviews and interrogations and the Reid Technique and information as to false confessions and wrongful convictions.    In DuVernay's own words during an interview:

> We did our research. We invited [the law enforcement personnel involved] to talk to me so I could hear their experience, just like I did with the men. Very few took me up on it. Some did off the record, so that their colleagues wouldn't know that they spoke. No one ever admitted any guilt. In their eyes, they didn't do anything wrong. That plus the court research and files that we were slipped, and material that we got a hold of that we weren't supposed to have, all the press coverage and all of the interviews gave us a robust picture of that time. From there we went about in constructing the story of the men.

76.    In another interview, DuVernay stated that she "[read] the court transcripts and all the paperwork on the case,"   and: "reached out to Ms. Meili, I reached out to Ms. Fairstein, I reached out to Ms. Lederer, I reached out to Mr. Sheehan—a lot of the key figures on the other side . . . [I] invited them to sit down with me and talk with me so that they could share their point of view and their side of things so that I could have that information."

77.    DuVernay has also mentioned that the statements within *When They See Us* are supported by the public record:

> "Everything that's in the piece [*When They See Us*] is public record and it's out there, it had been, it had been told before by journalists, in books, in articles, in documentary, in podcasts, I mean the story had been told".

78.    None of the DuVernay Defendants' research reflected that the Reid Technique includes striking and assaulting subjects during interrogations, abusing juvenile subjects and withholding parental supervision during unduly long hours of interrogation, and depriving subjects

of bathroom breaks and food. And none of their research reflected that the Reid Technique has been universally rejected.

79. The DuVernay Defendants entertained serious doubts as to the truth of the statements within *When They See Us* that the Reid Technique includes striking and assaulting subjects during interrogations, abusing juvenile subjects and withholding parental supervision during long hours of interrogation, and depriving subjects of bathroom breaks and food. The DuVernay Defendants also entertained serious doubts as to the truth of the statement that the Reid Technique has been universally rejected.

80. Regardless of their serious doubts as to truth, the DuVernay Defendants – in collaboration with Netflix - published the false statements in *When They See Us* that identified the Reid Technique with the squeezing of statements from juvenile subjects "after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision". They also published the false statement that the Reid Technique had been "universally rejected".

81. The DuVernay Defendants published the false statements as to Reid through fabricating a conversation that did not occur between Detective Sheehan, Prosecutor Ryan, and Ryan's partner, who did not exist and was created by DuVernay. The DuVernay Defendants intended, and the context in *When They Us* reflects, that Ryan and her partner be viewed as the people who discovered what truly happened to the five defendants.

82. The DuVernay Defendants intended that *When They See Us* should, and the series did, assign blame for the abusive interrogations, coerced confessions, wrongful convictions, and imprisonments of the five defendants. The DuVernay Defendants intended that the blame include Reid and fabricated a scene designed to broadcast to the audience a conversation they made up that included false statements as to the Reid Technique.

83.     Netflix and the DuVernay Defendants have profited greatly from *When They See Us*. With the knowledge and consent of the DuVernay Defendants, Netflix continues to republish *When They See Us* by making it available for streaming worldwide by its members.  The series has now been viewed for approximately four months and remains readily available to all Netflix subscribers to view. *When They See Us* has been viewed in Illinois and elsewhere by members of law enforcement, private security, and educational institutions, among others. Reid's customers and target audience include the same groups.

84.     *When They See Us* has been nominated for numerous Emmy Awards, all but ensuring that it will continue to be viewed by millions going forward.

85.     Reid, on the other hand, has been substantially harmed by Defendants' defamatory statements as to Reid's business and profession.

86.     A significant percentage of the more than 500,000 professionals who have attended Reid's training programs since 1974 are likely to have already viewed, or will view, *When They See Us*. In fact, at nearly all of its seminars and programs, Reid now fields questions and negative feedback regarding *When They See Us* and its criticism of the Reid Technique.  Accordingly, Reid has now dedicated a regular section of its training seminars and programs to addressing *When They See Us* and the Central Park Jogger Case. Reid's inclusion of these additional corrective measures has been a drain on its time and resources.

87.     Reid has also expended substantial time and resources to create marketing materials, such as articles and blog posts, which rebut the false statements and conclusions contained in *When They See Us.*

88.     The false statements in *When They See Us* have impaired Reid's reputation and standing in the business community and have discouraged customers and clients from utilizing

Reid or purchasing Reid's training packages. The defamatory statements have caused Reid a loss of revenue and profits.

89. On July 31, 2019, counsel for Reid sent correspondence to David Hyman, General Counsel for Netflix, informing him that Netflix had defamed Reid in the *When They See Us* series. (A copy of the July 31, 2019 letter is attached as Exhibit 1). The letter requested that Netflix attempt to mitigate the damages to Reid by editing and deleting from the on-demand version of the series the statements mentioning Reid. The letter demanded that Netflix issue a written retraction of the defamatory statements. The correspondence also requested that Netflix preserve all documents relating to Reid, the Reid Technique, and the *When They See Us* and *Making A Murderer* series. Netflix received the correspondence on August 1, 2019.

90. Netflix refused Reid's requests and demands made in the July 31, 2019 correspondence. Netflix has had the control and ability to edit the content of *When They See Us* so as to delete the defamatory reference to the Reid Technique. Netflix has not deleted or retracted the defamatory statements in *When They See Us* and continues to make the series available for streaming to its more than 150 million subscribers.

91. The July 31, 2019 correspondence also alerted Netflix to the falsity or reckless disregard for the truth as to the statements made in *When They See Us* as to Reid and the Reid Technique.

92. Since receipt of the July 31, 2019 correspondence, Netflix, with the consent and knowledge of the DuVernay Defendants, has continued to air the *When They See Us* series that includes the aforesaid statements as to the Reid Technique, despite knowing that the statements are false or in reckless disregard to their falsity.

93.     Because Netflix offered, and continues to offer *When They See Us* for streaming to its subscribers worldwide at any time, Reid has sustained damages and will continue to sustain damages so long as *When They See Us* and the defamatory statements therein remain available to Netflix subscribers.

94.     Because Reid will continue to be harmed so long as Netflix continues to offer to its subscribers *When They See Us* in the present form containing the defamatory statements, it will be impossible for Reid to obtain adequate relief by way of money damages alone because of the damage to its goodwill and reputation.

95.     Reid will suffer irreparable harm because its reputation and goodwill will continue to be diminished for as long as the defamatory content within *When They See Us* is available to Netflix's subscribers, many of which are Reid's former, current, or prospective customers. The false descriptions of the Reid Technique will also continue to irreparably harm Reid's goodwill and reputation.

## COUNT I
### (Defamation *Per Se* - Netflix)

96.     Reid hereby reasserts and re-alleges paragraphs 1 through 95 as though fully set forth herein.

97.     Netflix has made and continues to publish false, defamatory statements of fact about Reid in *When They See Us*, which include the following:

> **You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you.**

98.     The conduct described in Netflix's statements is not the Reid Technique. Netflix's statements falsely identify the Reid Technique with "42 hours of questioning and coercing, without food, bathroom breaks, [and] withholding parental supervision."

99.     Netflix's statements are also false because the Reid Technique has not been universally rejected.

100.     Netflix knew when it made the statements that they were false, or exercised a reckless disregard for their truth.

101.     Netflix's statements are defamatory, as they cause harm to the reputation of Reid, lower Reid in the eyes of the community, and deter customers and clients from associating with Reid.

102.     Netflix made an unprivileged publication of the false, defamatory statements when it released *When They See Us* to all Netflix subscribers for streaming on May 31, 2019.

103.     Netflix has also made unprivileged republications of the false, defamatory statements in *When They See Us* by continuously making the series available for streaming worldwide to all of its members.

104.     Netflix's publications of the false, defamatory statements are defamatory *per se* because they impute a want of integrity in Reid's business, particularly its use of the Reid Technique, and also prejudice Reid and impute a lack of ability in its trade, profession, or business.

105.     Netflix has acted with actual malice in publishing the false, defamatory statements.

106.     Netflix's conduct proximately caused Reid actual damages.

107.     Netflix is wealthy and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Reid prays for judgment against Netflix and an award of:

(1)     Actual damages in an amount to be determined at trial, but exceeding $75,000;

(2)     Punitive damages;

(3)     The entry of a permanent injunction prohibiting Netflix from making *When They See Us* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory references to the Reid Technique from any version of *When They See Us* made available for streaming or in any other method of transmission or format; and

(4)     For such other and further relief as the Court deems just and equitable.

## COUNT II
### (Defamation *Per Quod* - Netflix)

108.    Reid hereby reasserts and re-alleges paragraphs 1 through 95 as though fully set forth herein.

109.    Netflix has made and continues to publish false, defamatory statements about Reid in *When They See Us*, including the following:

**You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you.**

110.    The conduct described in Netflix's statement is not the Reid Technique.  Netflix's statements falsely identify the Reid Technique with "42 hours of questioning and coercing, without food, bathroom breaks, [and] withholding parental supervision."

111.    Netflix's statements are also false because the Reid Technique has not been universally rejected.

112.    Netflix knew when it made the statements that they were false, or exercised a reckless disregard for their truth.

113. Netflix's statements are defamatory, as they cause harm to the reputation of Reid, lower Reid in the eyes of the community, and deter customers and clients from associating with Reid.

114. Netflix made an unprivileged publication of these false, defamatory statements when it released *When They See Us* to all Netflix subscribers for streaming on May 31, 2019.

115. Netflix has also made unprivileged republications of the false, defamatory statements in *When They See Us* by continuously making the series available for streaming worldwide to all of its members.

116. Reid has suffered substantial damages as a result of Netflix's defamatory conduct.

117. At nearly all of its seminars and programs, Reid now fields questions and negative feedback regarding *When They See Us* and its criticism of the Reid Technique. Accordingly, Reid has now dedicated a regular section of its training seminars and programs to addressing *When They See Us* and the Central Park Jogger Case. Reid's inclusion of these additional corrective measures is costly and has been a drain on its time and resources.

118. Reid has also expended substantial time and resources to create marketing materials, such as articles and blog posts, which rebut the false statements and conclusions contained in *When They See Us.*

119. The false statements in *When They See Us* have impaired Reid's reputation and standing in the business community in Illinois and elsewhere and have discouraged customers and clients from utilizing Reid or purchasing Reid's training packages. The cumulative effect of the foregoing have substantially reduced Reid's revenue and profits.

120. Netflix has acted with actual malice in publishing the false, defamatory statements.

121. Netflix's conduct proximately caused Reid actual damages.

122.   Netflix is wealthy and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Reid prays for judgment against Netflix and an award of:

(1)   Actual damages in an amount to be determined at trial, but exceeding $75,000;

(2)   Punitive damages;

(3)   The entry of a permanent injunction prohibiting Netflix from making *When They See Us* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory references to the Reid Technique from any version of *When They See Us* made available for streaming or in any other method of transmission or format; and

(4)   For such other and further relief as the Court deems just and equitable.

## COUNT III
### (False Light - Netflix)

123.   Reid hereby reasserts and re-alleges paragraphs 1 through 95 as though fully set forth herein.

124.   Reid has been placed in a false light before the public as a result of Netflix's actions when it published *When They See Us*, which includes the following:

> **You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you.**

125.   The conduct described in Netflix's statement is not the Reid Technique. Netflix's statements falsely identify the Reid Technique with "42 hours of questioning and coercing, without food, bathroom breaks, [and] withholding parental supervision."

126.     Netflix's statements are also false because the Reid Technique has not been universally rejected.

127.     Netflix knew when it made the statements that they were false, or exercised a reckless disregard for their truth.

128.     The false light caused by Netflix's conduct would be highly offensive to a reasonable person or business.

129.     Netflix's publications of these false statements which place Reid in a false light are defamatory *per se* because the statements impute a want of integrity to Reid's business, particularly its use of the Reid Technique, and also prejudice Reid and impute a lack of ability to its trade, profession, or business.

130.     Further, Reid has suffered substantial damages as a result of Netflix's defamatory conduct.

131.     At nearly all of its seminars and programs, Reid now fields questions and negative feedback regarding *When They See Us* and its criticism of the Reid Technique. Accordingly, Reid has now dedicated a regular section of its training seminars and programs to addressing *When They See Us* and the Central Park Jogger Case. Reid's inclusion of these additional corrective measures is costly and has been a drain on its time and resources.

132.     Reid has also expended substantial time and resources to create marketing materials, such as articles and blog posts, which rebut the false statements and conclusions contained in *When They See Us.*

133.     The false statements in *When They See Us* have impaired Reid's reputation and standing in the business community and have discouraged customers and clients from utilizing

Reid or purchasing Reid's training packages. The cumulative effect of the foregoing has proximately caused a substantial reduction in Reid's revenue and profits.

134. Netflix has acted with actual malice in publishing the false, defamatory statements.

135. Netflix's conduct proximately caused Reid actual damages.

136. Netflix is wealthy and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Reid prays for judgment against Netflix and an award of:

(1) Actual damages in an amount to be determined at trial, but exceeding $75,000;

(2) Punitive damages;

(3) The entry of a permanent injunction prohibiting Netflix from making *When They See Us* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory references to the Reid Technique from any version of *When They See Us* made available for streaming or in any other method of transmission or format; and

(4) For such other and further relief as the Court deems just and equitable.

**<u>COUNT IV</u>**
**(Unjust Enrichment - Netflix)**

137. Reid hereby reasserts and re-alleges paragraphs 1 through 95 as though fully set forth herein.

138. Reid has suffered a detriment to its products and services in that the Reid Technique has been falsely disparaged by Netflix, which has impaired Reid's reputation and standing in the business community and has diverted business opportunities away from Reid.

139.    Netflix has unjustly retained a benefit to Reid's detriment by profiting from its false and disparaging statements regarding the Reid Technique in *When They See Us*.

140.    Netflix's retention of its profits associated with *When They See Us* violates fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Reid prays for judgment against Netflix including:

(1)    A disgorgement of Netflix's profits associated with *When They See Us*;

(2)    The entry of a permanent injunction prohibiting Netflix from making When They See Us in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory references to the Reid Technique from any version of *When They See Us* made available for streaming or in any other method of transmission or format; and

(3)    For such other and further relief as the Court deems just and equitable.


## COUNT V
### (Defamation *Per Se* – DuVernay Defendants)

141.    Reid hereby reasserts and re-alleges paragraphs 1 through 95 as though fully set forth herein.

142.    The DuVernay Defendants made false, defamatory statements of fact about Reid when they published *When They See Us*, which include the following:

**You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you.**

143.    The conduct described in the DuVernay Defendants' statements is not the Reid Technique.  The DuVernay Defendants' statements falsely identify the Reid Technique with "42

hours of questioning and coercing, without food, bathroom breaks, [and] withholding parental supervision."

144. The DuVernay Defendants' statements are also false because the Reid Technique has not been universally rejected.

145. The DuVernay Defendants knew when they made the statements that they were false, or exercised a reckless disregard for their truth.

146. The DuVernay Defendants' statements are defamatory, as they harm the reputation of Reid, lower Reid in the eyes of the community, and deter customers and clients from associating with Reid.

147. The DuVernay Defendants made an unprivileged publication of the false, defamatory statements when they published *When They See Us* in collaboration with Netflix on May 31, 2019.

148. The DuVernay Defendants, in collaboration with Netflix, have also made unprivileged republications of the false, defamatory statements in *When They See Us* by consenting and encouraging Netflix to make *When They See Us* continuously available for streaming worldwide to all of Netflix's members.

149. The DuVernay Defendants' publications of the false, defamatory statements are defamatory *per se* because they impute a want of integrity to Reid's business, particularly its use of the Reid Technique, and also prejudice Reid and impute a lack of ability to its trade, profession, or business.

150. The DuVernay Defendants have acted with actual malice in publishing the false, defamatory statements.

151. The DuVernay Defendants' conduct proximately caused Reid actual damages.

152.    The DuVernay Defendants are wealthy and punitive damages are warranted in an amount sufficient to punish them and to deter them and others from such wrongful conduct.

**WHEREFORE**, Reid prays for judgment jointly and severally against the DuVernay Defendants and an award of:

(1)    Actual damages in an amount to be determined at trial, but exceeding $75,000;

(2)    Punitive damages; and

(3)    For such other and further relief as the Court deems just and equitable.

<u>**COUNT VI**</u>
**(Defamation *Per Quod* – DuVernay Defendants)**

153.    Reid hereby reasserts and re-alleges paragraphs 1 through 95 as though fully set forth herein.

154.    The DuVernay Defendants made  false, defamatory statements about Reid when they published *When They See Us*, which contain the following:

> **You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you.**

155.    The conduct described in the DuVernay Defendants' statements is not the Reid Technique.  The DuVernay Defendants' statements falsely identify the Reid Technique with "42 hours of questioning and coercing, without food, bathroom breaks, [and] withholding parental supervision."

156.    The DuVernay Defendants' statements are also false because the Reid Technique has not been universally rejected.

157.    The DuVernay Defendants knew when they made the statements that they were false, or exercised a reckless disregard for their truth.

158.    The DuVernay Defendants' statements are defamatory, as they cause harm to the reputation of Reid, lower Reid in the eyes of the community, and deter customers and clients from associating with Reid.

159.    The DuVernay Defendants made an unprivileged publication of these false, defamatory statements when they published *When They See Us* in collaboration with Netflix on May 31, 2019.

160.    The DuVernay Defendants, in collaboration with Netflix, have also made unprivileged republications of the false, defamatory statements in *When They See Us* by consenting and encouraging Netflix to make *When They See Us* continuously available for streaming worldwide to all of Netflix's members.

161.    Reid has suffered substantial damages as a result of The DuVernay Defendants' defamatory conduct.

162.    At nearly all of its seminars and programs, Reid now fields questions and negative feedback regarding *When They See Us* and its criticism of the Reid Technique.  Accordingly, Reid has now dedicated a regular section of its training seminars and programs to addressing *When They See Us* and the Central Park Jogger Case.  Reid's inclusion of these additional corrective measures is costly and has been a drain on its time and resources.

163.    Reid has also expended substantial time and resources to creating marketing materials, such as articles and blog posts, which rebut the false statements and conclusions contained in *When They See Us.*

164.    The false statements in *When They See Us* have impaired Reid's reputation and standing in the business community in Illinois and elsewhere and have discouraged customers and

clients from utilizing Reid or purchasing Reid's training packages. The cumulative effect of the foregoing have substantially reduced Reid's revenue and profits.

165.    The DuVernay Defendants have acted with actual malice in publishing the false, defamatory statements.

166.    The DuVernay Defendants' conduct proximately caused Reid actual damages.

167.    The DuVernay Defendants are wealthy and punitive damages are warranted in an amount sufficient to punish them and to deter them and others from such wrongful conduct.

**WHEREFORE**, Reid prays for judgment jointly and severally against the DuVernay Defendants and an award of:

(1)     Actual damages in an amount to be determined at trial, but exceeding $75,000;

(2)     Punitive damages; and

(3)     For such other and further relief as the Court deems just and equitable.

## COUNT VII
### (False Light – DuVernay Defendants)

168.    Reid hereby reasserts and re-alleges paragraphs 1 through 95 as though fully set forth herein.

169.    Reid was placed in a false light before the public as a result of the DuVernay Defendants' actions when they published *When They See Us*, which contain the following:

> **You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you.**

170.    The conduct described in the DuVernay Defendants' statements is not the Reid Technique. The DuVernay Defendants' statements falsely identify the Reid Technique with "42

hours of questioning and coercing, without food, bathroom breaks, [and] withholding parental supervision."

171.     The DuVernay Defendants' statements are also false because the Reid Technique has not been universally rejected.

172.     The DuVernay Defendants knew when they made the statements that they were false, or exercised a reckless disregard for their truth.

173.     The false light caused by the DuVernay Defendants' conduct would be highly offensive to a reasonable person or business.

174.     The DuVernay Defendants' publications of these false statements which placed Reid in a false light were defamatory *per se* because the statements impute a want of integrity to Reid's business, particularly its use of the Reid Technique, and also prejudice Reid and impute a lack of ability to its trade, profession, or business.

175.     Further, Reid has suffered substantial damages as a result of the DuVernay Defendants' defamatory conduct.

176.     At nearly all of its seminars and programs, Reid now fields questions and negative feedback regarding *When They See Us* and its criticism of the Reid Technique.  Accordingly, Reid has now dedicated a regular section of its training seminars and programs to addressing *When They See Us* and the "Central Park Jogger Case." Reid's inclusion of these additional corrective measures is costly and has been a drain on its time and resources.

177.     Reid has also expended substantial time and resources to create marketing materials, such as articles and blog posts, which rebut the false statements and conclusions contained in *When They See Us.*

178.    The false statements in *When They See Us* have impaired Reid's reputation and standing in the business community and have discouraged customers and clients from utilizing Reid or purchasing Reid's training packages. The cumulative effect of the foregoing has proximately caused a substantial reduction in Reid's revenue and profits.

179.    The DuVernay Defendants have acted with actual malice in publishing the false, defamatory statements.

180.    The DuVernay Defendants' conduct proximately caused Reid actual damages.

181.    The DuVernay Defendants are wealthy and punitive damages are warranted in an amount sufficient to punish them and to deter them and others from such wrongful conduct.

**WHEREFORE**, Reid prays for judgment jointly and severally against the DuVernay Defendants and an award of:

(1)    Actual damages in an amount to be determined at trial, but exceeding $75,000;

(2)    Punitive damages; and

(3)    For such other and further relief as the Court deems just and equitable.

<u>**COUNT VIII**</u>
**(Unjust Enrichment – DuVernay Defendants)**

182.    Reid hereby reasserts and re-alleges paragraphs 1 through 95 as though fully set forth herein.

183.    Reid has suffered a detriment to its products and services in that the Reid Technique has been falsely disparaged by the DuVernay Defendants, which has caused Reid's reputation and standing in the business community to be impaired, and has diverted business opportunities away from Reid.

184.    The DuVernay Defendants have unjustly retained a benefit to Reid's detriment by profiting from their false and disparaging statements regarding the Reid Technique in *When They See Us*.

185.    The DuVernay Defendants' retention of its profits associated with *When They See Us* violates fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Reid prays for judgment jointly and severally against the DuVernay Defendants including:

(1)    A disgorgement of the DuVernay Defendants' profits associated with *When They See Us*; and

(2)    For such other and further relief as the Court deems just and equitable.


Respectfully submitted,

JOHN E. REID & ASSOCIATES, INC.


By: _____
     One of Its Attorneys

Jack J. Carriglio (jcarriglio@cozen.com)
Corey T. Hickman (chickman@cozen.com)
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, Illinois  60606
Tel:  312-474-7900
Fax:  312-382-8910