**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN E. REID AND ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-cv-06781 |
| v. | ) | |
| | ) | Honorable Manish Shah |
| NETFLIX, INC., AVA DUVERNAY, and | ) | |
| ARRAY ALLIANCE, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT NETFLIX INC.'S MOTION TO DISMISS**

Natalie J. Spears
Gregory R. Naron
Jacqueline A. Giannini
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.giannini@dentons.com

*Attorneys for Defendant Netflix, Inc.*

The four-part film series *When They See Us* (the "Series"), released by Defendant Netflix, Inc. ("Netflix"), is a critically-acclaimed dramatization of the story of the five teenage boys who were wrongfully accused, convicted and imprisoned, based on false confessions, in the 1989 "Central Park Jogger" case. The Series follows the lives of the boys and their families as they vulnerably wind their way through the criminal justice system: convicted despite inconsistent confessions and lack of physical evidence, the boys spend the rest of their youth in prison only to be exonerated years later based on the DNA and confession of the real attacker.

Plaintiff John E. Reid and Associates, Inc. ("Reid"), the developer of the interrogation technique most widely used by police in this country, is now suing Netflix and the Series' filmmaker, Ava DuVernay[1], claiming it was defamed by a fleeting reference to "the Reid Technique" in one line of dialogue in last episode of the Series. The fact is, this lawsuit seeks to punish, and ultimately enjoin, one side of the debate over a matter of vital public concern— whether a controversial interrogation technique used by police is susceptible to abuse and can result in wrongful convictions. The dialogue at issue is fully protected speech under the First Amendment and is not actionable as a matter of law. Permitting this case to go forward would not only be contrary to law, it would have a profoundly chilling effect on core First Amendment speech.

The complained-of dialogue appears in a scene depicting an argument in 2002 between one of the detectives who had obtained the teenagers' confessions in 1989, and an investigator from the District Attorney's office. Angrily confronting the detective with the confessions' falsity and that the true perpetrator had since been discovered, the investigator asserts: "You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally

---

[1] The Court does not have personal jurisdiction over DuVernay (or Array Alliance, which had nothing to do with this production), and those Defendants are separately moving to dismiss on those grounds.

rejected. That's truth to you?" (First Amended Complaint ("FAC") ¶ 58.) The detective

responds: "I don't even know what the fucking Reid Technique is. Okay? I know what I was

taught. I know what I was asked to do and I did it." (*Id*. ¶ 59.)

Plaintiff's attempt to hang a defamation claim on the "universally rejected" language

utterly fails. That is exactly the kind of "overly loose, figurative, rhetorical, or hyperbolic

language" that has long been protected under the First Amendment. *Hopewell v. Vitullo*, 299 Ill.

App. 3d 513, 518 (1998); *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.,* 227 Ill. 2d

381, 397-98 (2008). Such sweeping, imprecise and unverifiable assertions are not actionable

under the Constitution and Illinois law, and are routinely dismissed by the courts.

As the Seventh Circuit has emphasized, "[c]ontext is key" in this inquiry, "as it matters

not only what was said, but who said it, where it was said, and the broader setting of the

challenged statements." *Bd. of Forensic Doc. Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir.

2019). Here, both the general literary context (a docudrama) and the specific setting in which

this exclamation was made (a heated debate in a bar between people with opposing views)

confirm its status as protected opinion and hyperbole. The speaker is clearly portrayed as a

combatant in a dispute, in the context of a "dramatic interpretation[] of events and dialogue filled

with rhetorical flourishes"; viewers will be "sufficiently familiar with this genre to avoid

assuming that all statements within them represent assertions of verifiable facts." *Partington v.*

*Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995).

Likewise, Plaintiff's attempt to claim defamation because the speaker purportedly

"correlat[ed] the Reid Technique to squeezing statements out of the five defendants 'after 42

hours of questioning and coercing'" (FAC ¶ 14) also fails. That claim is squarely foreclosed by

Illinois' innocent construction rule. Under the rule, if, viewed in context, a statement may

reasonably be interpreted in non-defamatory way it is not actionable. *Lansing v. Carroll*, 2015

WL 3962345, *3 (N.D. Ill. June 29, 2015) (Shah, J.) (ordering dismissal). Here, the detective's response *expressly refutes* that this conduct had anything to do with the "Reid Technique" and instead says that he did "what [he] was taught" and "what [he] was asked to do and [he] did it." Read in the context of the scene, and the rest of the Series, which nowhere mentions Plaintiff or the Reid Technique, the exchange can be construed as expressing that the conduct in question pertains to the individual detectives who conducted the interrogation and as raising questions about what the Reid Technique even is, let alone whether it was used. There is no balancing under the rule; if an innocent construction exists, as it does here, the claim fails.

"The protections afforded by the first amendment to freedom of speech and the press were designed to assure 'unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Imperial Apparel,* 227 Ill. 2d at 393 (citations omitted). Motion pictures are a "significant medium for the communication of ideas" and an "organ[] of public opinion" protected by the First Amendment. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). That is surely true of the award-winning Series here, which illuminated the injustice visited upon the five boys wrongfully convicted in the Central Park Jogger case (the "Exonerated Five") and raised questions for public scrutiny and debate about the controversial use of confrontational and deceptive police tactics, and breakdowns in the justice system, that lead to false confessions. The dialogue Plaintiff complains of reflects that crucial debate—one that the First Amendment protects. Dismissal with prejudice is in order.

## FACTUAL BACKGROUND

*The Series.* The Series portrays the real-life story of the Exonerated Five—Yusef Salaam, Antron McCray, Kevin Richardson, Raymond Santana, and Korey Wise—and "how they were accused of a crime they did not commit; convicted based on false confessions, despite a lack of physical evidence; and forced to grapple with the subsequent trial, prison time, and return to

society as grown men after their imprisonment." (*See* FAC ¶ 6.)

The Series also portrays the 2002 re-investigation of the case, based on "a confession and DNA evidence reflecting the guilt of Mathias Reyes, a man not among the five defendants, the dismissal of charges, and the release of the five defendants who were still in prison at that time." (*Id*. ¶ 55.) And it "reflects a 2014 settlement award of 41 million dollars by the City of New York to the five defendants arising from their claims that their convictions and imprisonments were wrongful and their interrogations and confessions were coercive and illegal." (*Id.*)

**The Reid Technique.** Plaintiff Reid is "the creator and developer of the Reid Technique, [ ] a widely used approach to question subjects in the course of interviews and interrogations" (FAC ¶ 19); Plaintiff alleges that Reid is the "leading law enforcement training firm" that has "developed the most widely used interrogation technique in the country." (*Id*. ¶¶ 40, 52, 53.) As stated in a post on Plaintiff's website,[2] because Reid's name "is so universally known,"

> it has become attached to all interview and interrogation techniques. . . .
> even those that are egregious and that we teach never to employ. It's
> like the name Kleenex. . . . became the universal term for a tissue. So to
> [*sic*] has the Reid name become associated with all interrogation
> techniques—even those that are bad.

The Reid Technique consists of first gathering information during what Plaintiff describes as a "non-confrontational," "non-accusatory" "interview" phase (FAC ¶¶ 30-32); if the investigator concludes the subject is not "truthful," they will initiate "[t]he interrogation phase," which "consists of nine steps which may cause a guilty subject to confess to his or her involvement and to relate details regarding the commission of a crime or incident" (*id.* ¶ 33). Thus, the premise for the Reid Technique's "interrogation" phase is that the subject is guilty; in contrast to the "interview" stage, the nine-step interrogation phase is "accusatory" and confrontational, and its

---

[2] *See* http://reid.com/pdfs/The_Reid_Technique%E2%80%A6what_is_really_going_on.pdf.
Plaintiff's Complaint refers extensively to material posted on its website, *see, e.g.,* FAC ¶¶ 27, 34-44.

goal is to overcome the subject's will to obtain a confession.[3]

  ***Criticism of the Reid Technique.*** Referring to the Seventh Circuit's decision in *Dassey v. Dittman*, 877 F.3d 297 (7th Cir. 2017) (which upheld the confession of a minor with learning disabilities), Plaintiff states that law enforcement in that case "fail[ed] to use the Reid Technique or adhere to the basic best practices guidelines that are clearly stated by Reid. . . ."  (FAC ¶ 49.) However, writing in dissent in *Dassey*, Judge Wood (joined by Judges Rovner and Williams) observes that "[m]any of the officers' tactics appear to be drawn from the 'Reid Technique,' which was for some time the most widely used interrogation protocol in the country," and "heavily relies on false evidence ploys and other forms of deceit" in its "nine–step approach".  877 F.3d at 320-21 (Wood, J., dissenting).  As noted in Judge Rovner's separate dissent,

> For many years, the Reid technique has been criticized by scholars and experts for increasing the rate of false confessions.  As far back as *Miranda*, the Supreme Court warned that "[e]ven without employing brutality, the 'third degree'" used in the Reid technique "exacts a heavy toll on individual liberty and trades on the weakness of individuals," and "may even give rise to a false confession."  *Miranda v. Arizona*, 384 U.S. 436, 455 & n.24 [ ] (1966). Recently, Wicklander–Zulawski & Associates, one of the nation's largest police consulting firms, said it will stop training detectives in the method it has taught since 1984, stating that it "is not an effective way of getting truthful information."

*Id.* at 335-36 (Rovner, J., dissenting).

  The *Dassey* majority opinion also acknowledged "understandable" concerns "about the potential coercive effects of the police tactics here," noting "the opinions of scholars who believe that certain interrogation tactics tend to produce false confessions" and that "[s]ome police departments and experts have acknowledged this criticism and have changed their interrogation practices in response."  877 F.3d at 317.  However, the court saw its hands as tied since "[t]hese

---

[3] *See* Reid Website, https://www.reid.com/educational_info/critictechnique.html; *see also* Saul M. Kassin, *On the Psychology of Confessions: Does Innocence Put Innocents at Risk?*, 60 Am. Psychologist 215, 220 (2005) (discussing "nine steps" of Reid Technique).

debates over interrogation techniques have not resulted in controlling Supreme Court precedent condemning the techniques used with Dassey." *Id.* at 318.

The article quoted in Judge Wood's *Dassey* dissent discusses the techniques pioneered by Reid and the use of "deception" in obtaining confessions from the Exonerated Five; "the interrogation tactic of leading each boy to believe that others had already confessed and implicated the others was particularly effective." Miriam S. Gohara, *A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques*, 33 FORDHAM URB. L.J. 791, 791-92, 809-11 (2006). "The empirical studies . . . illuminate the phenomena that took place in the Central Park Jogger case: the coercive effect of deceptive interrogation techniques and the unreliability of the confessions they induce." *Id.* at 831.[4]

The debate and controversy over application of the Reid Technique has been extensively discussed in the wider press. Indeed, a magazine article cited in Plaintiff's Complaint (FAC ¶ 70), notes that "in one of the most notorious cases of false confession in recent memory"—the case of Juan Rivera, sentenced by an Illinois court to life in prison for rape and murder, but subsequently exonerated—"part of the interrogation was conducted at Reid headquarters by a Reid trainer." Douglas Starr, *The Interview: Do Police Interrogation Techniques Produce False Confessions?*,

---

[4] Other examples of the body of legal and social science scholarship critical of the Reid Technique include: Dylan J. French, *The Cutting Edge of Confession Evidence: Redefining Coercion and Reforming Police Interrogation Techniques in the American Criminal Justice System*, 97 TEX. L. REV. 1031, 1035-36 (April 2019) ("the Reid accusatory model of interrogation has . . . been heavily criticized" and "many of its assumptions about coercion and human behavior have since been either discredited or significantly undermined"); Brian R. Gallini, *Police "Science" in the Interrogation Room: Seventy Years of Pseudo-Psychological Interrogation Methods to Obtain Inadmissible Confessions*, 61 HASTINGS L.J. 529 (Feb. 2010) ("the outdated Reid technique . . . was crafted from a 'science' already discredited by nearly every court in the nation" and it "unnecessarily risks obtaining inherently unreliable confessions"); Timothy E. Moore & C. Lindsay Fitzsimmons, *Justice Imperiled: False Confessions and the Reid Technique*, 57 CRIM. L. Q. 509 (2011) (Reid Technique principles "are scientifically indefensible"); Saul M. Kassin, *The Psychology of Confession Evidence*, 52 AM. PSYCHOLOGIST 221 (1997) (criticizing Reid Technique as unsupported by and contrary to empirical research).

THE NEW YORKER (Dec. 1, 2013). Rivera obtained a settlement of his wrongful conviction case against the state, county—and Reid itself. Douglas Starr, *Juan Rivera and the Dangers of Coercive Interrogation*, THE NEW YORKER (May 22, 2015). The Rivera case is emblematic of the concerns voiced by "[a] growing number of scientists and legal scholars . . . about Reid-style interrogation": false confessions, "which often lead to [wrongful] convictions"—including "in such notorious cases" as the Central Park Jogger case—"are not rare, and experts say that Reid-style interrogations can produce them." Starr, *The Interview*.[5]

**The Complained-Of Dialogue.** The line of dialogue on which this suit is based appears in a scene in the final episode of the Series, depicting a 2002 conversation "between Michael Sheehan, a New York City detective who worked on the Central Park Jogger Case and was involved in eliciting defendants' confessions, Nancy Ryan, a Manhattan Assistant District Attorney who oversaw the 2002 re-investigation which led to the dismissal of the charges against the five defendants, and another 'Man' who is assisting Ryan as her 'partner' in the re-investigation." (FAC ¶¶ 7, 56.) In the course of a heated argument about the adequacy of the investigation and the boys' confessions, Sheehan says "[t]hey gave statements that I believe were true" (*id.* ¶ 57); the "Man" then says to Sheehan:

> "You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's truth to you[?]"
>
> "Sheehan responds: 'I don't even know what the fucking Reid Technique is. Okay? I know what I was taught. I know what I was asked to do and I did it.'" (*Id.* ¶¶ 58, 59.)

---

[5] *See also* Starr, *Juan Rivera* ("the past few decades have seen a growing number of psychologists and advocates question whether the [Reid] technique isn't coercive and prone to producing false confessions. Now a twenty-million-dollar wrongful-conviction settlement has provided fuel to Reid's detractors" and "reinforces two important points: that the Reid technique can be coercive, and that lying to a suspect during a police interview can be enormously damaging"); Robert Kolker, A Severed Head, Two Cops, and the Radical Future of Interrogation, *Wired* (May 24, 2016) ("England and Canada . . . both abandoned Inbau-Reid-style interrogation tactics long ago as unethical and unreliable").

Plaintiff claims the "statements relating to the Reid Technique falsely disparage and defame Reid" by (1) "falsely correlat[ing] the Reid Technique to squeezing statements out of the five defendants 'after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision'"; and (2) stating that the "Reid Technique has been universally rejected".  (*Id.* ¶¶ 14, 60-61.)  Understanding that the Sheehan character's response completely undermines Plaintiff's defamatory reading of the encounter, Plaintiff does not mention it until 20 pages into its Complaint (*id.* ¶ 59), and then asserts in conclusory fashion that Sheehan's statement "does not detract from Defendants' making clear that it was indeed the Reid Technique, a technique Defendants represent as having been 'universally rejected'" (*id.* ¶ 63).

## ARGUMENT

Plaintiff's claims fail as a matter of law under well-established First Amendment and Illinois precedent.  To survive a motion to dismiss, Plaintiff cannot simply regurgitate labels, conclusions, or "a formulaic recitation of the elements of a cause of action[.]"  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "while the Court must take all well-pleaded allegations in a complaint as true for the purposes of determining a motion to dismiss, the Court need not 'take the plaintiff's *interpretation* of the allegedly defamatory words at face value.'"  *Ludlow v. Nw. Univ.*, 79 F.Supp.3d 824, 838 (N.D. Ill. 2015) (quoting *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009) (italics in original)).[6]

---

[6] Since Plaintiff only selectively quotes from the Series episode, Defendant submits herewith a video copy of the four-part Series, including the full scene.  (*See* Ex. 1. The relevant scene is in Episode 4 at 1:05:45.)  Consideration of the full context of the scene and Series is appropriate because it is "central to [Plaintiff's] claim" and referenced in the complaint; as such the Court may properly consider it on this motion. *Venture Assocs. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431-32 (7th Cir. 1993) (citing, *e.g., Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir. 1988) (considering magazine article at issue on 12(b)(6) motion)); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (court may consider "video recordings attached to *or referenced in* a complaint" on a motion to dismiss) (emphasis added); *Taggart v. WMAQ Channel 5*, 2000 WL 1923322, *1 n. 1 (S.D. Ill. Oct. 30, 2000) (considering videotape of news broadcast on a motion to dismiss) (citing *Venture Assocs.* and *Fudge*).

I.       **The Hyperbolic, Exaggerated Speech of Which Plaintiff Complains Is Non-Actionable Opinion Protected by the First Amendment.**

The First Amendment "protects overly loose, figurative, rhetorical, or hyperbolic language, which negates the impression that the statement actually presents facts." *Hopewell*, 299 Ill. App. 3d at 518; *Imperial Apparel*, 227 Ill. 2d at 397-98. Such "imaginative expression" and "rhetorical hyperbole [ ] has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain J. Co.,* 497 U.S. 1, 20 (1990). Accordingly, "an allegedly defamatory statement is protected by the first amendment unless the plaintiff shows that the statement is factual[.]" *Imperial Apparel, Ltd.*, 227 Ill. 2d at 398-99. In other words, "[a] statement that is otherwise defamatory is protected under the first amendment, if the statement is an expression of the speaker's opinion." *Jacobson v. Gimbel*, 2013 IL App (2d) 120478, ¶ 35 (affirming dismissal). This is a question of law for the Court. *Brennan v. Kadner*, 351 Ill. App. 3d 963, 969 (2004); *MiMedx Group, Inc. v. Fox*, 2018 WL 558500, **5-6 (N.D. Ill. Jan. 24, 2018) (Shah, J.) (ordering dismissal).

"To determine whether a given statement is one of fact or opinion, Illinois courts generally rely on three criteria: (1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether its literary or social context signals that it has factual content." *Lansing*, 2015 WL 3962345, at *3; *Imperial Apparel*, 227 Ill. 2d at 398. Under this test, where "potentially defamatory statements" are made in a "setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." *Brennan*, 351 Ill. App. 3d at 969.

A.       **Far-Reaching, Imprecise and Hyperbolic Speech Is Not Actionable.**

The "universally rejected" language at issue here is hyperbolic, exaggerated speech that is not actionable under the First Amendment. Defendant nevertheless contends: "'Universally'

means including or covering all or a whole collectively without limit or exception. 'Rejected' means not given approval or acceptance," and therefore "[t]he statement that the Reid Technique has been 'universally rejected' is false" because it "tells the viewer that the Reid Technique is not approved or accepted by anyone" and "without exception interviewers and interrogators have not approved or accepted the Reid Technique. . . ."  (FAC ¶ 64.)

Of course, the common definition of words like "traitor," "blackmail," "incompetent" etc. did not prevent the U.S. and Illinois Supreme Courts and others from finding such statements to be rhetorical hyperbole, not actionable defamation.  *See, e.g., Imperial Apparel*, 227 Ill. 2d at 397-98 (citing cases).  Thus, in *Imperial Apparel*, the court gave as an example of "the type of exaggerated, figurative and hyperbolic speech that the first amendment protects," a statement that the plaintiffs were "the biggest crooks on the planet."  *Id.*; *see also Lansing*, 2015 WL 3962345, at *7 ("While the term 'unsavory' may be readily understood as meaning unpleasant or distasteful, these are concepts with no inherent boundaries").  The interplanetary scope of the "universal rejection" comment is similarly boundless and hyperbolic protected speech.

In *Bd. of Forensic Document Exam'rs, Inc. v. ABA*, a forensic document examiner organization claimed it was defamed by the statement that a competing organization, "The American Board of Forensic Document Examiners . . . is *the only certification board recognized by the broader forensic science community, law enforcement, and courts* for maintaining principles and training requirements concurrent with the published training standards.  Be wary of other certifying bodies."  922 F.3d at 830 (emphasis added).  But the district court held this was "just an expression of [the speaker's] opinion, rather than a verifiable, objective fact," particularly since "the statement's breadth—saying that the 'scientific community, law enforcement, and courts' recognize the American Board—is so sweeping that the lack of specificity makes the statement even more difficult to verify as if it were a *fact*."  287 F. Supp. 3d 726, 737-38 (N.D. Ill. 2018)

(emphasis in original). Affirming, the Seventh Circuit confirmed that the statement "reflects the expression of a viewpoint, as the statement is so broad as to lack objective, verifiable meaning." 922 F.3d at 833.

Here, the "universally rejected" language is even more "sweeping" and indefinite, and *a fortiori* protected by the First Amendment. Indeed, the defamatory meaning Plaintiff tries to extract from the hyperbolic dialogue here—"that the Reid Technique is not approved or accepted by anyone"—was *explicitly stated* in *ABA*, and nevertheless found to be protected opinion. The phrase is no different from saying that Plaintiff's "product" is "outdated" "junk," which was held to be a "mere statement[] of opinion and rhetorical hyperbole protected by the First Amendment." *RM Acquisition, LLC v. One20, Inc.*, 2017 WL 4122761, *3 (N.D. Ill. Sep. 18, 2017).

Further, where, as here, "an alleged defamatory statement lacks a specific factual context, the statement is not objectively verifiable and is a nonactionable opinion." *Jacobson*, 2013 IL App (2d) 120478, ¶ 35 (citing *Schivarelli v. CBS, Inc.*, 333 Ill. App. 3d 755, 762 (2002)). Thus, for similar reasons, in *Freiburger v. Timmerman*, 2016 WL 4493448 (N.D. Ill. Aug. 26, 2016) (Shah, J.), this Court held the term "struggling" was "an imprecise term that, in isolation, is not verifiable. . . ." *Id*. at *12.[7]

Here too, the phrase "universally rejected" is entirely abstract and unmoored from any facts. The fleeting line of dialogue mentioning the Reid Technique comes out of the blue, with no specific factual context. What is meant by "rejected"—let alone "universally rejected"—is

---

[7] *See also Schivarelli*, 333 Ill. App. 3d at 762 (reporter's statement that "the evidence seems to indicate" plaintiff was "cheating the city" not objectively verifiable because not made in any specific factual context; reporter did not explain the evidence, how plaintiff was cheating or what she meant by "cheating"); *MiMedx Group*, 2018 WL 558500, at *6 (statements in email that plaintiff former employee "was ineffective and inadequate" not actionable because they were vague, broad, and "without a more precise understanding of what [defendant] meant, it would be impossible to determine whether or not these statements were true"); *Lansing*, 2015 WL 3962345, at *7 (context of statement did not "provide the necessary factual boundaries, and [its] precise meaning . . . remains ambiguous").

"too broad, conclusory and vague to be objectively verifiable". *Id.* (internal citations omitted). *See also Lifton v. Bd. of Ed. of City of Chi.*, 416 F. 3d 571, 579 (7th Cir. 2005) ("offhand statements" that teacher was "lazy," "unstable," and "doesn't want to work" were "bare statements contain[ing] no verifiable factual information" and hence nonactionable). Neither Reid nor the Reid Technique is ever mentioned in the Series before or after the complained-of exchange, and it is not explained what the Man speaking to Detective Sheehan meant by the reference to Reid or the imprecise phrase "universally rejected"—a reference that befuddles Detective Sheehan himself. "A reasonable [viewer] would not take the generic statements as a literal assertion of objectively verifiable fact". *MiMedx Group*, 2018 WL 558500, at *6.

### B.     The Dramatic Literary Context Confirms the Dialogue's Hyperbolic Nature.

The "literary or social context" of the dialogue (*Imperial Apparel*, 227 Ill. 2d at 398) is also critical here, further signaling to readers "that what is being read . . . is likely to be opinion." *Quinn v. Jewel Food Stores*, 276 Ill. App. 3d 861, 867 (1995); *ABA*, 922 F.3d at 832 ("context"— including "what was said, but who said it, where it was said, and the broader setting"—"is key").

For example, in *Hopewell*, the "tenor and context of the article" in which the complained-of statement about plaintiff's "incompetence" appeared "also plainly show that the statement was nonactionable opinion"; as here, the statements arose from a dispute (between a politician and plaintiff, a former campaign worker), and "[r]eaders easily could conclude" in light of "the conflict between the parties" the statement was "rhetoric." 299 Ill. App. 3d at 520; *see also MiMedx Group*, 2018 WL 558500, at *6 (defendant's press release was "not a news story written by an apparently neutral party" and would not be taken as statement of objective facts).

Here, both the specific scene in the Series (a fiery argument in a bar) and the general literary context (a dramatization) confirm the statement as one of rhetorical hyperbole. As the Ninth Circuit has explained, "[d]ocudramas, as their name suggests, often rely heavily upon

dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience. We believe that viewers in this case would be sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts." *Partington*, 56 F.3d at 1155.

Applying a three-part test substantively identical to the Illinois Supreme Court's in *Imperial Apparel, supra*, the *Partington* court held as a matter of law that statements in a television docudrama based on a book about a murder case did not defame plaintiff defense attorney. There, the author, Bugliosi, is portrayed as saying to his client, "If I defend you the way Partington is defending [a co-defendant], you'll spend the rest of your life in prison". As here, "the speaker does not outline the factual basis for his conclusion," and "the context in which the statement was made negates the impression that it implied the assertion of an objective fact." Specifically, the "use of hyperbolic language strongly suggests that the movie character was not making an objective statement of fact" but instead was "a rhetorical device" and, "at a broader level, a dramatic passage of dialogue designed to maintain the viewer's attention". *Id.* at 1157.

As in *Partington*, the Series is a gripping dramatization of controversial historical events and Defendants "have substantial latitude in describing the events involved. . . ." *Id.* at 1154. As the court put it, the First Amendment provides "'breathing space' in order to criticize and interpret the actions and decisions of those involved in a public controversy. If they are not granted leeway in interpreting ambiguous events and actions, the public dialogue that is so important to the survival of our democracy will be stifled." *Id.* at 1159. Such impermissible stifling of discourse is this lawsuit's aim. It is a shot across the bow intended to chill any speaker that invokes the Reid Technique in connection with the ongoing debate over police interrogation methods and false confessions. But under the First Amendment's protection, Plaintiff's claims fail as a matter of law.

13

## II. The Allegedly Defamatory Statements Also Are Not Actionable *Per Se* Because They Are Subject to an Innocent Construction.

Plaintiff's claims also fail because under Illinois law, "even a statement that might otherwise be considered defamatory *per se* is not actionable as such if, when viewing the statement in context and giving to its words their natural and obvious meaning, the statement may reasonably be interpreted: (1) in an innocent (non-defamatory) way; or (2) as referring to someone other than the plaintiff." *Lansing*, 2015 WL 3962345, at *3. Innocent construction is "a question of law that the court may decide." *Id.* (ordering dismissal); *Pope v. Chronicle Publ. Co.,* 95 F.3d 607, 613 (7th Cir. 1996). If, read in context, a publication has a reasonable non-defamatory interpretation, dismissal is warranted. No balancing between competing reasonable interpretations is allowed. *Lott*, 556 F.3d at 568 ("Courts need not weigh the relative value of competing constructions; instead, any reasonable, non-defamatory interpretation is the one that sticks"; dismissal affirmed); *Freiburger*, 2016 WL 4493448, at *5 (same, ordering dismissal). This is because the purpose of the innocent construction rule is to "encourag[e] the robust discussion of daily affairs" and give breathing room for debate on matters of concern to individuals and the public at large. *Dauw v. Field Enterps.*, 78 Ill. App. 3d 67, 71 (1979).

Plaintiff's first complained-of statement ("The Reid Technique has been universally rejected") is not only constitutionally protected opinion, but is also subject to an innocent construction. In the context of the dramatic scene in which it appears, it is merely the rhetoric of a biased partisan in heated debate, as discussed above. Reasonable viewers would recognize it as such. For example, in *Owen v. Carr*, 113 Ill. 2d 273 (1986), defendant quoted a source who was involved in a dispute with plaintiff. The complained-of statement was that plaintiff, an attorney, was "trying deliberately to intimidate" a judge. *Id.* at 277. But in *Owen*, as here, the statement was subject to an innocent construction: the opinion or "biased presentation" of an interested

14

party to a dispute.  *Id.* at 280.[8]

Plaintiff's second purported claim of defamation is even more of a stretch and also fails under innocent construction.  The Man speaking to Detective Sheehan does *not* say that "42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision" equates to "the Reid Technique"—that is Plaintiff's interpretive leap.  In fact, the Sheehan character refutes that conclusion with his response—he has no idea what the Man is talking about when he raises the "Reid Technique" ("I don't even know what the fucking Reid Technique is. Okay?").  Sheehan's retort raises the question of what the "Reid Technique" even is and whether he and his colleagues were deploying the "Reid Technique" in 1989.  The dialogue itself provides an innocent construction; the *individual police and prosecutors*, not the Reid Technique, were responsible for the actions taken to obtain the false confessions.

Further, the innocent construction rule holds that if statements can reasonably be interpreted "as referring to someone other than the plaintiff," they "cannot be actionable[.]" *Pope*, 95 F.3d at 613 (citations omitted).  Thus, in *Lansing,* the Court innocently construed the complained-of statements concerning an investment project that plaintiff was doing with another party as being about the "deceitful" conduct of the other party, not plaintiff, noting that on its face, "[n]othing in the statement indicates that" plaintiff "somehow participated in the 'deceit' of which [defendant] complains."  2015 WL 3962345, at *4.  If anything, that is even more true of the exchange between the Man and Sheehan, in which the Man heatedly asserts that "*You* squeezed statements out of them after 42 hours of questioning and coercing," and Sheehan *expressly refutes* the notion that this conduct had anything to do with the "Reid Technique," and that instead, he did

---

[8] *See also Haberstroh v. Crain Publ'ns, Inc.,* 189 Ill. App. 3d 267, 271 (1989) ("the statements may reasonably be innocently construed as hyperbolic rhetoric of the viewpoints espoused in plaintiff's article"); *Seith v. Chi. Sun-Times, Inc.*, 371 Ill. App. 3d 124, 138 (2007) (statement could be innocently construed in view of the "public and social context of rhetoric uttered during a political campaign").

"what [he] was taught" and "what [he] was asked to do and [he] did it." (FAC ¶ 59.)[9] Reid or the Reid Technique are nowhere mentioned in the Series to that point (or after). There is no textual or contextual basis for assuming a connection between Reid and the NYPD's conduct—a connection Sheehan expressly refutes. Again, read in the context of the scene, and the rest of the Series, it is a far more reasonable reading that the conduct in question pertains to Sheehan and the other individual participants in the interrogation, not John E. Reid and Associates.

Moreover, even if it were *also* reasonable to read the recited conduct as referring to Reid, there is *no balancing* of reasonable constructions. In *MiMedx Group*, for example, the defendant made allegedly defamatory remarks about "lack of integrity" in connection with four employees it had fired (one of whom was the plaintiff) and more recently discovered employee conduct. The Court dismissed under innocent construction, finding that while the statement could be read to refer to the four fired employees "an equally likely reading is that it refers to the other employees referenced" by defendant. *Id.* at *5. The same result is called for here. Dismissal is in order.

## III.    Plaintiff's Purported Libel *Per Quod* Claims Fail for Additional Reasons.

The constitution's opinion protection bars both Plaintiff's alleged "defamation *per se* and *per quod* claims." *Liu v. Nw. Univ.*, 78 F. Supp. 3d 839, 849 (N.D. Ill. 2015). And while the innocent construction rule applies only to actions for defamation *per se*, *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 412 (1996), Plaintiff's *per quod* claim is judged under interpretive principles similar to the innocent construction rule, *i.e.*, a "statement should be read as a whole and the words given their natural and obvious meanings" and "the meaning of the statement should be gathered from context and not from the words read singly". *Allen v. Ali*, 105 Ill. App. 3d 887, 889-90 (1982).

---

[9] That is also consistent with Plaintiff's own observation that "Reid Technique" is a generic term like Kleenex when it comes to police interrogation tactics. *See* p. 4 n. 2, *supra*. It is reasonable therefore to read the Man's comment as referring to "Reid Technique" in this generic sense, and not to Plaintiff itself.

Under that test, given the context of the scene and the Series, a *per quod* claim attempting to link Sheehan's conduct to Reid via the unexplained reference to "Reid Technique" also fails as a matter of law. "[I]n context," the dialogue "is not normally susceptible of the defamatory meaning ascribed to it by plaintiff." *Id.* (statement that plaintiff spoke "in a very slow partially incoherent voice" not actionable *per quod*; plaintiff "complains of only one word in this four-page letter"— "incoherent"—and it was not defamatory in context); *Ecton v. Van Houten N. Am., Inc,*, 1996 WL 296587, at *4 (N.D. Ill. May 31, 1996) (holding statements not actionable *per quod* "when read in context . . . for the same reasons they are subject to innocent construction").

In addition, to state a *per quod* claim, plaintiff must not only identify false statements of fact which are not defamatory on their face, but also "extrinsic facts . . . which would render the otherwise non-defamatory statements defamatory and actionable," and special damages. *Am. Int'l Hosp. v. Chi. Tribune*, 136 Ill. App. 3d 1019, 1026 (1985). Plaintiff does none of the above.

First, Plaintiff has not pleaded any "extrinsic circumstances" that "demonstrate [the] injurious meaning" of the statements (*Schivarelli,* 333 Ill. App. 3d at 759); self-serving characterizations and constructions of words spoken do not replace well pleaded extrinsic facts and fail to establish libel *per quod*. *Harris Trust v. Phillips*, 154 Ill. App. 3d 574, 583 (1987). Second, Plaintiff fails to adequately plead special damages with the necessary specificity. Plaintiff has only made the blanket, unsupported assertion that the alleged defamation "impaired Reid's reputation and standing in the business community"; "discouraged customers and clients from utilizing Reid or purchasing Reid's training packages" and "caused Reid a loss of revenue and profits." (FAC ¶ 92.) These are precisely the kind of general allegations the courts repeatedly hold insufficient as a matter of law. *See, e.g., Lott,* 556 F.3d at 570; *Bruck v. Cincotta*, 56 Ill. App. 3d 260, 266-67 (1978); *Schaffer v. Zekman,* 196 Ill. App. 3d 727, 733 (1990); Fed. R. Civ. P. 9(g).

17

IV.     **Plaintiff, a Corporation, Cannot Bring a False Light Claim, Which Would Fail for the Same Reasons as the Defamation Claim in Any Event.**

Corporations cannot sue for false light under Illinois law. *See, e.g., J.H. Desnick, M.D. v. Capital Cities/ABC, Inc.,* 851 F. Supp. 303, 307 (N.D. Ill. 1994) ("The right to privacy is a personal right which courts have not extended to protect corporations"), *aff'd in part, rev'd in part on other grounds,* 44 F.3d 1345 (7th Cir. 1995).[10] Plaintiff is a corporation. (FAC ¶ 19.) For this reason alone, Counts III and VII should be dismissed.

Further, even if properly asserted by this corporate plaintiff, if the complained-of statement "is protected by the first amendment, [it] not only cannot serve as the predicate for plaintiffs' defamation claims, it cannot serve as the basis for their 'false light'" claims. *Imperial Apparel*, 227 Ill. 2d at 393; *Brennan*, 351 Ill. App. 3d at 971 (same); *Jefferson v. Winnebago Cty.*, 1995 WL 89064, *14 n. 15 (N.D. Ill. Mar. 2, 1995) ("under Illinois law, the innocent construction rule and the defense of opinion apply equally to false light claims") (citing *Harte v. Chi. Council of Lawyers*, 220 Ill. App. 3d 255, 263 (1991); *Schaffer,* 196 Ill. App. 3d at 734 n. 2).[11]

V.      **Plaintiff's Tag-Along Claims for Unjust Enrichment, Commercial Disparagement and Violation of the Illinois Deceptive Trade Practices Act Fail as a Matter of Law.**

Plaintiff's claims for "unjust enrichment" (Counts IV and VIII), and the FAC's new claims—afterthoughts following the original filing—for "commercial disparagement" (Counts

---

[10] The Restatement (2d) of Torts—on which the Illinois Supreme Court relied in recognizing the "false-light privacy tort," *Lovgren v. Citizens First Nat'l Bank*, 126 Ill. 2d 411, 421 (1989)—at Section 652I, comment c holds that "[a] corporation . . . has no personal right of privacy. It has therefore no cause of action for any of the four forms of invasion of privacy. . . ."

[11] Special damages and actual malice must also be alleged (and ultimately proven) in false light actions. *Lovgren*, 126 Ill. 2d at 422. Plaintiff fails to plead special damages with particularity. *See* discussion *supra*. Plaintiff also cannot plead or prove actual malice—which, as a public figure, it will ultimately be required to establish to prevail on *any* of its claims. Plaintiff alleges, at most, that Defendants failed to verify facts, which "is precisely what the Supreme Court has said is insufficient to establish reckless disregard for the truth." *Pippen v. NBC Univ. Media*, 734 F.3d 610, 614 (7th Cir. 2013) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)).

IX, X) and violation of the Illinois Deceptive Trade Practices Act, 815 ILCS § 510/2 ("DTPA") (Count XI) also fail. They all are based solely on the same alleged defamation, and the same First Amendment-based protections that doom the defamation claim, doom these claims, regardless of how Plaintiff chooses to characterize its cause of action.

Permitting Plaintiff to found such claims on the same facts would allow it to avoid the rules of defamation law, and courts routinely dismiss claims attempting that end-run. *See, e.g., Imperial Apparel*, 227 Ill. 2d at 402 ("a determination that language is not actionable under the first amendment not only is fatal to plaintiffs' defamation claims, it precludes them from obtaining recovery under any of the other common law and statutory claims [commercial disparagement and Consumer Fraud Act]"); *Flip Side, Inc. v. Chi. Tribune Co.,* 206 Ill. App. 3d 641, 656 (1990) (tort claims based on same publication as defamation count would not be "treat[ed] . . . separately").

Additionally, "Illinois state courts have held that, in effect, the DTPA codified the common law tort of commercial disparagement." *World Kitchen, LLC v. Am. Ceramic Soc'y*, 2015 WL 5461564, at *2 (N.D. Ill. Sep. 15, 2015). And such claims are limited to commercial speech. *World Kitchen, LLC v. Am. Ceramic Soc'y*, 2015 WL 3429380, at *2 (N.D. Ill. May 27, 2015) (plaintiff "must also prove that the alleged speech at issue, Defendants' published article, was commercial and not protected by the First Amendment") (citing *People ex. rel. Hartigan v. Maclean Hunter Publ'g Corp.*, 119 Ill. App. 3d 1049, 1059-61 (1983) (DTPA prohibits "commercial speech"; while defendant's allegedly misleading advertising of its "Red Book" manual of vehicle pricing information was potentially actionable under the Act, the contents of the book were not). The Series is decidedly not "commercial," but fully protected First Amendment speech. *Joseph Burstyn, Inc.*, 343 U.S. at 501-502.

## <u>CONCLUSION</u>

Defendant Netflix respectfully requests the Court dismiss the Complaint with prejudice.

Dated:  November 26, 2019

Respectfully submitted,

DENTONS US LLP

/s/ Natalie J. Spears

One of the attorneys for Defendant

Natalie J. Spears
Gregory R. Naron
Jacqueline A. Giannini
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000

*Attorneys for Defendant Netflix, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of November 2019 a copy of the foregoing was filed

electronically via the ECF filing system and hand-delivered to the following:

Jack J. Carriglio
Corey T. Hickman
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
*Attorneys for Plaintiff*

/s/ Natalie J. Spears