JOHN E. REID AND ASSOCIATES, INC.,

      Plaintiff,

    v.

NETFLIX, INC., AVA DUVERNAY, and
ARRAY ALLIANCE, INC.,

      Defendants.

No. 19 CV 6781

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

More than an hour into the fourth and final episode of the Netflix series *When They See Us*, a prosecutor corners one of the New York City detectives who, in episode one, was seen coercing confessions out of five innocent teenagers. During their exchange, the prosecutor says that the "Reid Technique has been universally rejected." Plaintiff John E. Reid and Associates Inc., owner of the trademarked method for interviewing criminal suspects called the Reid Technique, says that was defamatory. But because the First Amendment protects non-factual assertions (and because neither defendants Ava DuVernay nor Array Alliance Inc. has sufficient minimum contacts with the State of Illinois to justify haling them into court here), Reid's complaint is dismissed.

## I. Legal Standards

A complaint must contain a short and plain statement that plausibly suggests a right to relief. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).

In ruling on a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, but need not accept legal conclusions, bare assertions, or conclusory allegations. *Ashcroft*, 556 U.S. at 680–82. Although it need not include detailed factual allegations, the complaint must provide more than labels and formulaic recitations of the elements of the cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint has to contain enough detail about its subject matter to "present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

As the plaintiff, Reid has the burden of establishing personal jurisdiction over each defendant and, in order to carry it, must make a prima facie showing of jurisdictional facts. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 393 (7th Cir. 2020). All well-pleaded facts are taken as true and all factual disputes are resolved in Reid's favor. *Curry,* 949 F.3d at 393.

## II. Facts

John E. Reid and Associates, Inc., is the Chicago-based company behind the Reid Technique, a structured interview and interrogation process popular with law enforcement agencies around the world. [17] ¶¶ 2, 3, 19.[1] The Reid Technique has

---

[1] Bracketed numbers refer to entries on the district court docket. The facts are taken from the First Amended Complaint, [17], Reid's briefs in opposition to the motions to dismiss, [40]; [42], the documents attached, [17-1]; [40-1], and, at Reid's request, *see* [42] at 6, the episodes themselves, which are described in, central to, and consistent with, the First Amended Complaint. *See* [17] ¶¶ 12, 13, 64; *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019); *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (court may consider "video recordings attached to or referenced in a complaint" on a motion to dismiss).

three steps: a factual analysis, a preliminary investigative interview, and (if necessary) an interrogation. *Id.* ¶¶ 3, 30–34. It prohibits the use of physical violence, promises of leniency, excessively long interrogations, and the denial of legal rights or physical needs, *id.* ¶¶ 3, 34, and urges extreme care and caution whenever the target is a juvenile. [17] ¶¶ 34, 36. Courts have often upheld confessions elicited by the technique. [17] ¶ 48.

Articles and presentations describing the Reid Technique have been available on Reid's website since at least 2013. [17] ¶¶ 35–37. Since at least 1986, Reid's textbook has warned investigators that they may not be able to use confessions obtained by physical force (or by threats of physical force, promises of leniency, or interrogations that involve multiple interrogators and lengthy periods of time). [17] ¶ 46.

Late last spring, defendant Netflix Inc. released a television series titled, *When They See Us*. [17] ¶ 54. Written and directed by defendant Ava DuVernay, the series tells the story of the exoneration of five young men of color wrongfully convicted of rape. [17] ¶¶ 4, 21, 54. Its four episodes portray the lead up to (and aftermath of) the "Central Park Jogger Case," which began in 1989 with the rape of a woman in Central Park, New York City, and ended more than ten years later when a re-investigation led to the withdrawal of the charges and the five men's release from prison. [17] ¶¶ 4, 54–55. In Netflix's version, actors recreate the interrogations, confessions, convictions, imprisonment, and release of the men. [17] ¶¶ 4, 54–55; [31]; *When They See Us*, Netflix (May 31, 2019), https://www.netflix.com/title/80200549. Netflix has

described the series as "portraying the real-life story" of the five teenagers. [17] ¶ 6. The credits ([31] at Episode 4, 1:27:05) contain the following disclaimer:

> While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue, and names are fictionalized for the purpose of dramatization. As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history.

In the first few episodes, New York City detectives (including one named Michael Sheehan) interrogate the young men (all of whom are between the ages of fourteen and sixteen). [17] ¶ 8. They strike and abuse them, isolate them from their parents, and subject them to many hours of continuous questioning without food or bathroom breaks. *Id.* Under pressure, the young men confess to crimes they did not commit. *Id.*

Many years later, Nancy Ryan (a Manhattan Assistant District Attorney) and another man (no one mentions his name in conversation, but the credits bill him as "Peter Casolaro") take a second look at the file. [17] ¶ 56. They debunk much of the evidence that was used to obtain the convictions and unearth DNA evidence pointing to someone else as the perpetrator—Matias Reyes. *Id.* ¶¶ 9, 56. Ryan and her partner come off as truth-telling heroes. *See* [17] ¶ 56.

Near the end of the final episode, Ryan and her partner confront Sheehan with their findings. [1] ¶ 10; [31] at Episode 4, 1:05:45. During a fictionalized conversation inside a bar, [17] ¶ 17, Ryan accuses Sheehan of wrongfully coercing the confessions and overlooking evidence that pointed to the true culprit. *Id.* ¶ 57; [31] at Episode 4, 1:05:45–1:06:58. In response, Sheehan says that the young men "gave statements

that I believe were true." *Id.* ¶ 57; [31] at Episode 4, 1:06:58. Ryan's partner shoots back, "You squeezed statements out of them after 42 hours of questioning and coercing, without food, bathroom breaks, withholding parental supervision. The Reid Technique has been universally rejected. That's 'truth' to you." [17] ¶ 58; [31] at Episode 4, 1:06:59. Sheehan retorts, "I don't know what the fucking Reid Technique is. Okay? I know what I was taught. I know what I was asked to do and I did it." [17] ¶ 59; [31] at Episode 4, 1:07:14.[2] Ryan's partner laughs in disbelief. [42] at 7, n.8 (the closed captioning reads, "laughs in disbelief"); [31] at Episode 4, 1:07:16. By the end of the fourth episode, Reyes has been convicted, the five men have been released from prison, and the City of New York has been forced to pay out a $41 million damages award. [17] ¶¶ 11, 12.

Reid alleges that defendants published that exchange despite knowing that the prosecutor's assessment of the Reid Technique was false (or, at least, despite entertaining serious doubts as to its accuracy), and that they did so to make the program more appealing, incite a reaction from their audience, and condemn the Reid Technique. [1] ¶¶ 17, 65. As evidence that the Reid Technique has not been "universally rejected," Reid points out that it has trained more than 200,000 people since 2002 (the year during which the scene in the bar supposedly took place). [17] ¶¶ 7, 64.

---

[2] The complaint quotes Sheehan as saying, "I don't even know…." [17] ¶ 56. But the word "even" is not audible in the submitted recording of the episode. I rely on the recording when quoting the scene.

Reid also alleges that the series defames it by creating the impression that the New York City detectives were acting in accordance with (rather than in violation of) the Reid Technique when they conducted the interrogations of the young men. *See* [42] at 10; [17] ¶ 15. Netflix has described the series as an "exploration and examination of the consequences of acceptance of the Reid Technique." [17] ¶ 16.

Both Netflix and DuVernay researched the Reid Technique before releasing the series. [17] ¶¶ 70, 75–77. Although the law enforcement personnel with whom DuVernay spoke never admitted wrongdoing, DuVernay corroborated the events depicted in *When They See Us* through journalistic accounts, press coverage, books, articles, documentaries, podcasts, court documents, and other publications. [17] ¶¶ 75–77. None of this research connects the interrogation methods used in the series to the Reid Technique. *Id.* ¶ 78.

At nearly all of Reid's recent seminars, someone has asked about *When They See Us* and its criticisms of the Reid Technique. *Id.* ¶ 90. As a result, Reid says it has been forced to spend time and resources addressing these questions, as well as writing blog posts and other articles correcting the false impressions created by the series. [17] ¶¶ 90–92. Reid brings claims against Netflix, DuVernay, and Array for defamation *per se*, defamation *per quod*, false light, unjust enrichment, and commercial disparagement, and a claim against Netflix under Illinois's Uniform Deceptive Trade Practices Act.

DuVernay resides in California. [17] ¶ 21. She is the chief executive officer of defendant Array Alliance Inc. (a Delaware corporation with its principal place of

business in California), one of the companies that produced *When They See Us*. [17] ¶ 22. The series is still available on Netflix and has been viewed by more than 23 million people (including some that watched from Illinois). [17] ¶¶ 18, 87.

## III. Analysis

### A. Personal Jurisdiction

DuVernay and Array move to dismiss the claims against them for lack of personal jurisdiction. [26]; [28]; Fed. R. Civ. P. 12(b)(2). The complaint alleges state-law claims, and this court has subject-matter jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332.[3] Personal jurisdiction is therefore governed by the law of the forum state, Illinois. *Tamburo*, 601 F.3d at 700; Fed. R. Civ. P. 4(k)(1)(A). Because the Illinois long-arm statute permits the exercise of personal jurisdiction to the full extent allowed by federal due process, the state statutory and federal constitutional inquiries merge. *Tamburo*, 601 F.3d at 700–01. The key question is whether DuVernay and Array have "sufficient minimum contacts with Illinois such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quotations omitted).

Personal jurisdiction is either general or specific. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). Reid does not argue that DuVernay's and Array's contacts were systematic or continuous enough to justify an exercise of

---

[3] DuVernay is a resident of California, [17] ¶ 21; [29] ¶ 2, and both Array and Netflix are Delaware corporations with their principal places of business in California. [17] ¶ 20; [29] ¶ 9. Reid is an Illinois corporation with its principal place of business in Illinois. [17] ¶ 19. The complaint seeks damages in excess of $75,000. [17] ¶ 111.

general personal jurisdiction, *see* [17]; [28] at 5 n.2; [40], and instead focuses on the three elements needed to establish specific personal jurisdiction: "(1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012) (citations omitted); *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 398 (7th Cir. 2020). DuVernay and Array should not be haled into court in a far-off state "solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted).

There is one relevant factual dispute that must be resolved in Reid's favor. Reid's complaint alleges that Array produced the show, [17] ¶¶ 1, 22, but DuVernay submitted an affidavit explaining that Array (a nonprofit entity that offers mentorship, education, and grant-making assistance) was not involved with *When They See Us* in any way, including its production and distribution. [29] ¶¶ 9–12. In response, one of Reid's attorneys submitted a declaration explaining that Reid named Array because it saw an Array logo alongside the names of other producers during the scrolling credits at the end of the show, and because a search revealed that Array Alliance Inc. was associated with DuVernay. [40] at 12; [40-1] ¶ 3–5. DuVernay says the logo at the end of the credits belongs to an entirely different company. [29] ¶ 12.

Without the benefit of an evidentiary hearing, I am required to resolve all factual disputes in Reid's favor. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782–83 (7th Cir. 2003); *Curry,* 949 F.3d at 393. The inference Reid's declaration asks me to draw—that because an Array logo appears at the end of the credits alongside other companies that were allegedly involved in the production of the show, Array Alliance Inc. must have also produced the show—is reasonable. Even though DuVernay's affidavit strongly suggests that Reid is mistaken, and even though I am allowed to weigh the evidence presented, I can only accept as true the facts in DuVernay's affidavit that do not conflict with portions of the complaint that have been supported through the submission of additional evidence. *Curry,* 949 F.3d at 393; *Purdue Research Found.*, 338 F.3d at 783 ("once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction"). The complaint says Array produced the show, [17] ¶ 1, 22, and Reid's attorneys have submitted an affidavit that supports that inference. [40-1]. I take that allegation as true.

Ultimately, it makes no difference. The complaint does not contain sufficient factual allegations to support an inference that, by producing the show, Array purposefully availed itself of the privilege of conducting business in (or otherwise directed its activities at) the State of Illinois. Whether Netflix has the requisite minimum contacts is immaterial to that analysis because "[e]ach defendant's contacts with the forum State must be assessed individually." *Keeton v. Hustler Magazine,*

*Inc.*, 465 U.S. 770, 781 n.13 (1984). The focus is on "the relationship among the defendant, the forum, and the litigation." *Calder v. Jones*, 465 U.S. 783, 788 (1984). The contacts that matter are those between DuVernay, Array, and Reid that relate to *When They See Us* and that connect Array and DuVernay to the State of Illinois. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014), as corrected (May 12, 2014).

The First Amended Complaint contains few details about those contacts. It says that Array produced the show, [17] ¶¶ 1, 22, and that DuVernay wrote, created, and directed it, [17] ¶¶ 1, 21, and that both collaborated with Netflix to release it for worldwide streaming. [17] ¶ 4. Nowhere does it allege that either Array or DuVernay exercised any control over Netflix, instructed Netflix to offer the series for streaming in Illinois, or did anything else to purposefully target Illinois via Netflix. The forum-targeting actions of distributors are not generally imputed to the people that created the distributed product, and Reid has not alleged any facts that suggest that Array or DuVernay should be treated any differently. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) (whether the two Floridian authors of an allegedly defamatory article could be haled into court in California was not to be judged according to the actions of the magazine for whom they had written the article); *Weller v. Flynn,* 312 F.Supp.3d 706, 718 (N.D. Ill. 2018) (company's efforts to distribute a film in Illinois cannot be imputed to individual producers based on their contributions to the film's production); *Colo'n v. Akil,* 449 Fed. App'x 511, 514 (7th Cir. 2011) (no personal jurisdiction over subsidiary of company that distributed a show that allegedly violated a writer's

copyright when there was no evidence that subsidiary had anything to do with the broadcast of the show and because none of the defendants knew that the plaintiff had been the original writer of the show); *Palnik v. Westlake Entm't, Inc.*, 344 Fed. App'x 249, 252 (6th Cir. 2009).

Array and DuVernay are not like the writers in *Calder*. In that case, two writers, working for the *National Enquirer* in Florida, wrote an allegedly defamatory article about Shirley Jones, a Californian entertainer. *Calder v. Jones*, 465 U.S. 783, 785–86 (1984). Neither writer visited California, but one conducted research by calling people that were located there. *Id.* The second writer reviewed and approved the subject of the article—knowing that twice as many copies of *National Enquirer* were sold in California as in any other state—and edited it in its final form. *Id.* That amounted to more than "mere untargeted negligence," *id.* at 789, because the writers had expressly aimed their actions at California knowing the article could have a devastating impact on the plaintiff where she lived and worked. *Id.* at 789–90. The crux of the decision was the fact that the "'effects' caused by the defendants' article— i.e., the injury to the plaintiff's reputation in the estimation of the California public— connected the defendants' conduct to California, not just to a plaintiff who lived there." *Walden v. Fiore,* 571 U.S. 277, 288 (2014).

In *Walden*, the Court clarified that plaintiffs like Reid cannot be the defendants' only link to the forum state. *Id.* at 288–89. There was no personal jurisdiction over the defendant in *Walden* because minimum contacts must be "analyzed with regard to the defendant's contacts with the forum itself, not with

persons residing there." *Id.* at 283–84. Due process protects "the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Id.* at 284–285.

Array's and DuVernay's conduct amounts to untargeted negligence that may have connected them to Reid, but did not connect them to the State of Illinois in any "meaningful way." *Walden,* 571 U.S. at 290. DuVernay's pre-release research involved interviewing people and reviewing records, *see* [17] ¶¶ 75–77, but if she traveled to Illinois in the process (or called anyone here) the complaint says nothing about it. *See* [17]; [29] ¶ 5 (DuVernay's affidavit says she did not contact anyone in Illinois during her research).[4] She has never lived in Illinois, owns no property in the state, and has visited Illinois fewer than six times in the last ten years (all on trips unrelated to the series). [29] ¶ 4–8. If Array did anything at all related to Illinois during its production of the show, the complaint says nothing about that, either. *See* [17]. And unlike the plaintiff in *Calder*, Reid has not alleged that either DuVernay or Array thought there would be an especially high number of viewers in Illinois, negating any inference that either had a financial motive to pick Reid because of its connection to Illinois. *See* [17]. Instead of overcoming these deficiencies with factual

---

[4] The complaint mentions two New Yorker articles that are critical of the Reid Technique. *See* [17] ¶ 70 (citing Douglas Starr, *The Interview: Do Police Interrogation Techniques Produce False Confessions?*, THE NEW YORKER (Dec. 1, 2013) *and* Douglas Starr, *Juan Rivera and the Dangers of Coercive Interrogation*, THE NEW YORKER (May 22, 2015)). These articles are mentioned to allege that Netflix's research did not reveal that abusive tactics were part of the Reid Technique (so the contrary suggestion in the series was false). *See* [17] ¶ 70. The articles make passing reference to Reid's Chicago origins and headquarters, but nothing in the articles suggests that to talk about the Reid Technique (or read articles about it in The New Yorker) is to target Illinois.

allegations regarding actions that DuVernay or Array took to target Illinois, Reid advances threadbare and unsupported conclusions. *See* [17] ¶¶ 82, 84; [40] at 11.

The content of the series has no meaningful connection to Illinois. *When They See Us* is about New York, not Chicago (or any other city in Illinois). The crime at its center takes place in Central Park, and the trials that follow play out in the Supreme Court of the State of New York. Only the most attentive student of interrogation protocol would have caught the single reference to the Reid Technique and, recalling the principal place of business of John E. Reid and Associates Inc., thought, "Illinois." The complaint does not plausibly suggest that DuVernay intended such a connection. And if the technique is as widely used as Reid says it is, [17] ¶ 2, the effect of the criticism has been felt well beyond Illinois's borders. To find that DuVernay should be haled into court here because she criticized a process sold by a company that happens to be located in Illinois would be to offend traditional notions of fair play and substantial justice. To find that Array should have to tag along just because it helped produce the show would offend those notions even more. DuVernay and Array's motion to dismiss for lack of personal jurisdiction, [26], is granted.[5]

---

[5] Reid suggests that any disputes about jurisdictional facts could be resolved at an evidentiary hearing. [40] at 13. There is no need for such a hearing because even when all of the factual disputes are resolved in Reid's favor, the facts do not support a finding of personal jurisdiction over either DuVernay or Array. Nor is there a need for jurisdictional discovery because the First Amended Complaint does not make out a colorable showing of personal jurisdiction. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 875–76 (7th Cir. 2006).

## B.     Defamation

When the parties submit to Illinois law and rely solely on it, federal courts sitting in diversity apply Illinois's defamation law. *Lott v. Levitt*, 556 F.3d 564, 567–68 (7th Cir. 2009). In Illinois, defamation is the "publication of a false statement that tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person." *Id.* at 568; *Tuite v. Corbitt*, 224 Ill.2d 490, 501 (2006). Defamation *per se* concerns statements that are so obviously harmful that injury to the plaintiff's reputation can be presumed. *Tuite v. Corbitt,* 224 Ill.2d 490, 501 (2006). There are five categories of *per se* defamation, but only two are pertinent here: (1) "statements imputing an inability to perform or want of integrity in performing employment duties" and (2) "statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business." *See id*. Defamation *per quod* includes defamation that requires extrinsic facts to explain the statement's defamatory character, *Wynne v. Loyola Univ. of Chicago*, 318 Ill.App.3d 443, 451 (1st Dist. 2000)[6], and defamatory statements that,

---

[6] In Illinois court, complaints for defamation *per quod* must contain enough extrinsic factual material to allow the court to assess whether facially non-defamatory statements are, in context, defamatory. *Am. Int'l Hosp. v. Chicago Tribune Co.*, 136 Ill.App.3d 1019, 1026 (1st Dist. 1985); *Bryson v. News Am. Publications, Inc.*, 174 Ill.2d 77, 87 (1996). There is reason to question whether that applies to complaints in federal court. *See Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924–27 (7th Cir. 2003) (warning against the application of Illinois pleading standards in defamation *per se* actions brought in federal court, but not addressing the proper standard for assessing *per quod* claims which, by definition, require an Illinois-law-defined amount of factual context); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013). Regardless, Reid's complaint says people are still learning and using the Reid technique and that the technique prohibits the use of physical violence and excessively long interrogations. [17] ¶¶ 3, 34, 64. That is enough to put Netflix on notice that Reid is claiming that external factual context reveals the falsity of the statements in *When They See Us*, Fed. R. Civ. P. 8; *Muzikowski*, 322 F.3d at 924–27, and, in any event, satisfies

although defamatory on their face, do not fall within one of the categories of defamation *per se. Bryson v. News Am. Publications, Inc.,* 174 Ill.2d 77, 103 (1996).

To ensure that public debate does not suffer for lack of "imaginative expression" and "rhetorical hyperbole," the First Amendment protects from defamation liability any statement that "cannot reasonably be interpreted as stating actual facts." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 2 (1990). *See also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339 (1974) ("[u]nder the First Amendment there is no such thing as a false idea"). The First Amendment's protection applies to Reid's *per se* and *per quod* claims equally. *See Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n,* 922 F.3d 827, 832 (7th Cir. 2019); U.S. Const. art. VI, cl. 2.

"Context is key." *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n,* 922 F.3d 827, 832 (7th Cir. 2019). What was said matters, but "who said it, where it was said, and the broader setting" matters, too. *Id. See also Wilkow v. Forbes, Inc.,* 241 F.3d 552, 555 (7th Cir. 2001) (a statement is not actionable "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts"). "[L]oose language" and "undefined slogans"—like saying something is "unfair" or "facist," or calling someone a "traitor," or accusing someone of blackmail—do not necessarily amount to falsifications of fact. *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin,* 418 U.S. 264, 284 (1974); *Greenbelt Co-op. Pub.*

---

the Illinois pleading standards, too. *See Am. Int'l Hosp.*, 136 Ill.App.3d at 1026; *Bryson*, 174 Ill.2d at 87.

*Ass'n v. Bresler*, 398 U.S. 6, 13 (1970). Such "give-and-take" is important to discussions of controversial topics. *Old Dominion*, 418 U.S. at 284. The First Amendment also protects sweeping proclamations that are "so broad as to lack objective, verifiable meaning." *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 833 (7th Cir. 2019).

When deciding whether a statement is protected opinion or actionable fact, Illinois courts assess three criteria: "(1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether its literary or social context signals that it has factual content." *Madison v. Frazier,* 539 F.3d 646, 654 (7th Cir. 2008). Illinois law "draws no firm dividing line" between opinion and fact. *Bd. of Forensic Document Examiners, Inc.*, 922 F.3d at 832. The focus of the test is on whether the statement amounts to an "objectively verifiable assertion." *Hopewell v. Vitullo*, 299 Ill.App.3d 513, 519 (1st Dist. 1998). "The vaguer and more generalized" the statement, the more likely it is to be protected. *Wynne v. Loyola Univ. of Chicago*, 318 Ill.App.3d 443 (1st Dist. 2000).

When the prosecutor tells Sheehan that the Reid Technique has been "universally rejected," he is using the kind of loose, hyperbolic rhetoric that is a protected part of the nation's discourse. *See Milkovich,* 497 U.S. at 2; *Old Dominion Branch*, 418 U.S. at 284; *Greenbelt Co-op. Pub. Ass'n*, 398 U.S. at 13. That's true whether one looks closely at the words themselves or more broadly at the context in which they are delivered. The phrase "universally rejected" is neither precise nor readily understood. Rejected by whom? And in what context? There are a lot of

potential answers—police departments, district attorneys, judges, academics, the public; courtrooms, station houses, supreme court opinions, peer-reviewed journals, kitchen tables, etc.—but none of them presents itself readily.

Reid thinks the statement is demonstrably false because people are still using and learning the technique today (and have been, more or less continuously, since the time the fictionalized conversation took place). But Reid's interpretation of "universally rejected" is too narrow. It places too much emphasis on the breadth of the word "universally" without grappling with the many meanings of "rejected." Whether the Reid Technique has been "universally rejected" is no more verifiable than whether anyone in the "broader forensic science community" has "recognized" someone other than the American Board of Forensic Document Examiners as "maintaining principles and training requirements concurrent with the published training standards." *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 833 (7th Cir. 2019). "Universally" is hyperbolic and the prosecutor cannot be taken literally to assert that all intelligent life in the known universe has rejected the technique—which means his statement is an imprecise, overwrought exclamation.

The prosecutor is also hardly the guileless automaton Reid makes him out to be. The show casts him and Ryan as truth-telling protagonists, but it never suggests either is incapable of exaggeration or deceit—especially in the throes of a barroom back-and-forth that plays out during the culmination of a months-long investigation. In the scene that Reid complaints about, the prosecutors ask probing questions and

make aggressive accusations perhaps in hopes of tripping Sheehan up and catching him in a lie. That's a technique that should be familiar to Reid, *see Dassey v. Dittman*, 877 F.3d 297, 320-21 (7th Cir. 2017) (Wood, J., dissenting), and one that encourages investigators to lay it on thick. Even a novice police-procedural viewer in Netflix's audience would pick up on that context and understand the character's aggressive word choice as a rhetorical device.

The statement was also made by a fictionalized character, during a fictionalized conversation, as part of series that uses actors and actresses, music, and imagined dialogue to dramatize historical events. The show sells itself as fact-based but cannot be mistaken for original footage. And while labeling something "fictitious" will not insulate it from a defamation action, *Muzikowski v. Paramount Pictures Corp.,* 322 F.3d 918, 925 (7th Cir. 2003); *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995), placing non-verifiable hyperbole in the mouth of a fictionalized character with an ax to grind provides a few layers of protection from civil damages for defamation. The social and literary context of *When They See Us* and the scene in the bar—as well as the non-verifiable nature of the phrase "universally rejected" and its imprecise, hyperbolic meaning—protect Netflix from liability for claiming that the Reid Technique has been universally rejected.[7]

---

[7] The Reid Technique has been the subject of controversy and debate. Experts and scholars criticized it before the release of *When They See Us. See Dassey*, 877 F.3d at 335–36 (Rovner, J., dissenting). To the extent Reid is complaining that the show echoes (and maybe amplifies) the voices of the critics that have examined Reid's ideas and found them wanting, it is "barking up the wrong tree." *Lott v. Levitt*, 556 F.3d 564, 570 (7th Cir. 2009). The remedy for that kind of dispute is "the publication of a rebuttal, not an award of damages." *Id*.

That decides Reid's first theory of liability. Its second theory is that the scene in the bar creates the impression that what happened in earlier episodes—the lengthy, coercive interrogations—was a depiction of the Reid Technique. This impression comes almost entirely from implication. Reid's take on the barroom scene is that when the prosecutor accuses Sheehan of subjecting the young men to forty-two hours of questioning without food, bathroom breaks, or advice from their parents, and then follows that accusation immediately by saying that "[t]he Reid Technique has been universally rejected," he is making a factual assertion that the Reid Technique involves the withholding of food, bathroom visits, and parental supervision for long periods of time. When Sheehan says he doesn't know what the Reid Technique is, and that he was just doing what he "was taught," Reid says the viewer is supposed to disbelieve Sheehan because Ryan's partner (whom the viewer is supposed to trust) laughs in disbelief.

The scene is not that simple. Again, the prosecutor has a motive; he wants Sheehan to confess. Bluffing about the unreliability of Sheehan's methods (while couching the bluff in technical terms to lend it an air of authority) might be part of a ploy to convince Sheehan the jig is up. When allegedly defamatory statements take place in a setting in which "the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole," language that might otherwise be thought of as statements of fact "may well assume the character of statements of opinion." *Brennan v. Kadner,* 351 Ill.App.3d 963, 970 (1st Dist. 2004).

Second, when Sheehan immediately responds that he does not know what the Reid Technique is, his delivery is forceful with an emphasizing expletive, and conclusive. *See* [31] at Episode 4, 1:07:14. Sheehan may be in denial about the veracity of the confessions and the show definitely makes him out to be one of the bad guys— but that line is supposed to be believed. The exchange dramatizes a difference between self-righteous (perhaps deservedly so) prosecutors and grizzled veteran detectives. ADA Ryan's partner may think he knows what the Reid Technique is, but he is not the best judge of what a detective like Sheehan knows (or should know). When he laughs in disbelief, the viewer receives two messages: (1) the character thinks Sheehan is lying, and (2) the detective doesn't subscribe to the prosecutor's labels, and didn't when he conducted the interrogations.

Another problem with Reid's take on the exchange is that it misunderstands the way the word "truth" is being used. When Sheehan says that the young men gave confessions that he "believe[d] were true," the other character responds by listing the problems with the confessions and, in light of those problems, implores Sheehan to explain how he could possibly believe that what the young men said was "true." Reid's transcription omits the scare quotes around the word that are conveyed by the actor's delivery; the prosecutor sarcastically declares "that's 'truth' to" Sheehan. *See* [17] ¶¶ 58–59. And so when the prosecutor "laughs in disbelief," he is laughing at least in part because he cannot believe that Sheehan is continuing to refuse to admit that the young men were innocent.

Judging how viewers might interpret "nebulous verbiage is difficult," so doubts should be resolved in favor of the non-moving party. *Action Repair, Inc. v. Am. Broad. Companies, Inc.*, 776 F.2d 143, 149 (7th Cir. 1985). But here, the task is made easier by a non-factual context and a plainly non-factual assertion. The prosecutor's remarks together with the detective's reaction cannot be taken to assert that the Reid Technique definitively involves the abusive practices that worry the character. The statements that Reid says are defamatory (either *per quod* or *per se*) are protected expression under the First Amendment.[8]

Reid's *per se* theory fails for an additional reason: the statements are reasonably capable of an innocent construction. *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009); *Tuite*, 224 Ill.2d at 501; *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003). "Figuring out the meaning of a statement" in order to determine whether it can be innocently construed is a question of law, and when doing so, courts should "draw from the context" and give the words their "natural and obvious meaning." *Lott,* 556 F.3d at 568 (quotation omitted); *Muzikowski*, 322 F.3d at

---

[8] Reid has, however, sufficiently plead specific damages of actual financial injury in support of his *per quod* claim. *See* Fed. R. Civ. P. 9(g); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003). In federal court, special damages must be specifically stated, which means "something less than the 'particularity' standard" embodied in Rule 9(b). *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013). It is enough if the plaintiff identifies a "concrete loss," *id.*, which includes alleging that, for instance, a publication has forced them to expend "time, money, and effort to reestablish" terms of credit that were withdrawn following publication. *Fleck Bros. Co. v. Sullivan*, 385 F.2d 223, 225 (7th Cir. 1967). Reid has not submitted itemized losses, *see Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013), but its complaint draws logical connections between the conduct and the harm, and describes in sufficient detail the types of monetary expenses Reid has incurred in trying to rectify that alleged harm. *See* [17] ¶¶ 90, 91.

927. A court need not take the plaintiff's interpretation of allegedly defamatory words "at face value," *Lott*, 556 F.3d at 569, but also should not interpret the statement in the light most favorable to the defendant. *Muzikowski*, 322 F.3d at 924–25. Once an innocent, non-defamatory interpretation is put forward, the inquiry is over. *Id.* at 925.

In *Muzikowski*, the plaintiff alleged that a movie depicted him in an unflattering light. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 921 (7th Cir. 2003). The movie studio argued that the depiction could be innocently construed to be referring not to the plaintiff, but to a fictional character. *Id.* at 925. Although there were some differences between the movie character and the plaintiff, there were enough similarities to suggest that the proffered innocent construction was not a compulsory inference; the allegation was that the character was the plaintiff and that stated a claim. *Id.* at 927.

Reid's complaint is different. Although the show (and the associated promotional statement, [17] ¶ 16) refers to the Reid Technique and links it to unreliable confessions, it does not reasonably and in context paint the technique with the defamatory brush. The reference in episode four, read in its "natural sense" and in the context of the series as a whole, *Bravo Realty, Inc. v. Columbia Broad. Sys.*, 84 Ill.App.3d 862, 867 (1st Dist. 1980), supports an innocent construction: what Sheehan did to the young men in the first episode of the series was not the Reid Technique, and could not have been because Sheehan did not know what the Reid Technique was. The accusatory prosecutor thought that the Reid Technique had been used, but

the detective who took the confessions did not. Reid's defamation *per se* claim fails because the allegedly defamatory statements in *When They See Us* are both capable of innocent construction and protected by the First Amendment.

### C.     Remaining Claims

Although the Supreme Court of Illinois has not yet addressed the issue, I predict that it would conclude that corporations like Reid cannot bring actions for false light because a corporation has no personal right of privacy. Restatement (Second) of Torts § 652I cmt. c (Am. Law Inst. 1977) (a corporation has no personal right of privacy and therefore has no cause of action for false light). The Supreme Court of Illinois follows the Restatement (Second) of Torts when assessing false light claims. *See Lovgren v. Citizens First Nat. Bank of Princeton*, 126 Ill.2d 411, 420 (1989). The "heart" of the tort of false light "lies in the publicity, rather than in the invasion into the plaintiff's physical solitude," and a plaintiff must "be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." *Lovgren*, 126 Ill.2d at 419–20. A corporation is not capable of such feeling. *See United States v. Morton Salt Co.,* 338 U.S. 632, 652 (1950) ("corporations can claim no equality with individuals in the enjoyment of a right to privacy"); *see also Auto-Owners Ins. Co. v. Websolv Computing, Inc.,* 580 F.3d 543, 549 n.4. (7th Cir. 2009) (citing Restatement (Second) of Torts § 652I cmt. c (Am. Law Inst. 1977) for the proposition that, under the common law, corporations do not have a personal right of privacy, including that protected by the tort of false light).

In any event, the innocent construction rule and First Amendment defense apply to false light claims, too. *Jefferson v. Winnebago Cty.*, No. 94 C 50151, 1995 WL 89064, at *14 n.15 (N.D. Ill. Mar. 2, 1995), *aff'd sub nom. Jefferson v. Ambroz*, 90 F.3d 1291 (7th Cir. 1996); *Harte v. Chicago Council of Lawyers*, 220 Ill.App.3d 255, 263 (1st Dist. 1991); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003). Netflix's motion to dismiss Reid's claim for false light is granted.

The analysis for Reid's remaining claims for unjust enrichment, commercial disparagement and violations of the Illinois Deceptive Trade Practices Act is much the same: the First Amendment protection that dooms Reid's defamation claims dooms those claims, too. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill.2d 381, 402 (2008) (if the First Amendment protects allegedly defamatory statements, those statements cannot form the basis of claims for false light, commercial disparagement and violations of Illinois's Uniform Deceptive Trade Practices Act); *World Kitchen, LLC v. Am. Ceramic Soc'y*, 2015 WL 5461564, at *2 (N.D. Ill. Sep. 15, 2015); *Freiburger v. Timmerman*, No. 13 CV 8174, 2016 WL 4493448, at *15 (N.D. Ill. Aug. 26, 2016) ("[s]tatements of opinion are nonactionable for commercial disparagement"); *Nieman v. Versuslaw, Inc.*, No. 12-3104, 2012 WL 3201935, at *6 (C.D. Ill. June 13, 2012), *report and recommendation adopted*, No. 12-3104, 2012 WL 3201931 (C.D. Ill. Aug. 3, 2012), *aff'd*, 512 Fed. App'x 635 (7th Cir. 2013) (conduct protected by the First Amendment cannot form the basis of an unjust enrichment action).

## IV. Conclusion

Array and DuVernay's motion to dismiss, [26], and Netflix's motion to dismiss, [23], are granted. The dismissal of Netflix is with prejudice. The First Amendment precludes liability for all of Reid's substantive claims and no additional factual context is necessary to resolve that legal issue. Reid has amended the complaint once and any further amendment would be futile. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,* 786 F.3d 510, 520 (7th Cir. 2015) ("[u]nless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss"). The dismissals of DuVernay and Array are without prejudice for lack of personal jurisdiction, but leave to amend is not granted because amendment would be futile. Any amended complaint that manages to establish personal jurisdiction over DuVernay and Array would run into to the same substantive deficiencies that proved fatal to the claims against Netflix. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: March 23, 2020